Slip Op. 16-44

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **UNITED STATES STEEL CORPORATION ET AL.,** | |
| **Plaintiff and Consolidated Plaintiffs,** | |
| **and** | |
| **MAVERICK TUBE CORPORATION ET AL.,** | |
| **Plaintiff-Intervenors,** | **Before: Claire R. Kelly, Judge** |
| **v.** | **Consol. Court No. 14-00263** |
| **UNITED STATES,** | **Public Version** |
| **Defendant,** | |
| **and** | |
| **MAVERICK TUBE CORPORATION ET AL.,** | |
| **Defendant-Intervenors.** | |

## OPINION AND ORDER

[Sustaining the U.S. Department of Commerce's final determination in the antidumping duty investigation of certain oil country tubular goods from India in part and remanding in part.]

Dated: May 5, 2016

Jeffrey David Gerrish and Jamieson L. Greer, Skadden Arps Slate Meagher & Flom, LLP, of Washington, DC, argued for plaintiff and consolidated defendant-intervenor United States Steel Corporation. With them on the brief was Robert E. Lighthizer.

Lizbeth R. Levinson, Kutak Rock LLP, of Washington, DC, argued for consolidated plaintiffs GVN Fuels Limited, Maharashtra Seamless Limited, and Jindal Pipes Limited. With her on the brief was Ronald M. Wisla.

Alan Hayden Price, Wiley Rein, LLP, of Washington, DC, for plaintiff-intervenors Maverick Tube Corporation and Boomerang Tube LLC.  With him on the brief was Robert Edward DeFrancesco, III.

Roger Brian Schagrin, Schagrin Associates, of Washington, DC, for plaintiff-intervenors and defendant-intervenors Boomerang Tube LLC, Energex Tube, Tejas Tubular Products, TMK IPSCO, Vallourec Star, L.P., and Welded Tube USA Inc.  With him on the brief was John Winthrop Bohn, and Paul Wright Jameson.

Justin Reinhart Miller, Senior Trial Counsel, International Trade Field Office, Civil Division, U.S. Department of Justice, of New York, NY, argued for defendant.  With him on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director, of Washington, DC.  Of counsel on the brief was David P. Lyons, Office of the Chief Counsel for Trade Compliance and Enforcement, U.S. Department of Commerce of Washington, DC.

Kelly, Judge:  This consolidated action comes before the court on USCIT Rule 56.2 motions for judgment on the agency record, challenging the Department of Commerce's ("Department" or "Commerce") final determination in the antidumping duty ("ADD") investigation of imports of certain oil country tubular goods ("OCTG") from India for the period of July 1, 2012 through June 30, 2013.  See Certain Oil Country Tubular Goods From India, 79 Fed. Reg. 41,981 (Dep't Commerce July 18, 2014) (final determination of sales at less than fair value and final negative determination of critical circumstances) ("Final Determination"); see also Issues and Decision Memorandum for Final Affirmative Determination in the Less than Fair Value Investigation of Certain Oil Country Tubular Goods from India, A-533-857, (Jul. 10, 2014), available at http://ia.ita.doc.gov/frn/summary/india/2014-16868-1.pdf (last visited April 17, 2016) ("Final Decision Memo").

United States Steel Corporation ("U.S. Steel") commenced this action pursuant to section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a (2012).[1]  The court consolidated U.S. Steel's challenge with an action filed by GVN Fuels Limited ("GVN"), an individual exporter of OCTG, Maharashtra Seamless Limited ("MSL") and Jindal Pipes Limited, ("JPL"), individual producers of OCTG (collectively "GVN Plaintiffs"). See Order, Jan. 21, 2015, ECF No. 25.  U.S. Steel, Consolidated Plaintiffs GVN Plaintiffs, and Plaintiff-Intervenors Maverick Tube Corporation ("Maverick") filed motions for judgment on the agency record pursuant to USCIT Rule 56.2.  See Mot. Pl. United States Steel for J. Agency R. Under Rule 56.2, Mar. 24, 2015, ECF No. 34; Consolidated Pls.' Rule 56.2 Mot. J. Agency R., Mar. 23, 2015, ECF No. 32; Mot. Pl.-Intervenor Maverick Tube Corporation J. Agency R., Mar. 23, 2015, ECF No. 30 ("Maverick Mot.").

## BACKGROUND

On July 29, 2013, in response to a petition filed by U.S. Steel and other petitioners, including Maverick, Commerce initiated a less-than-fair-value ("LTFV") investigation of OCTG from India.  See Certain Oil Country Tubular Goods from India, the Republic of Korea, the Republic of the Philippines, Saudi Arabia, Taiwan, Thailand, the Republic of Turkey, Ukraine, and the Socialist Republic of Vietnam, 78 Fed. Reg. 45,505 (Dep't Commerce Jul. 29, 2013) (initiation of ADD investigations).  On August 26, 2013, Commerce selected GVN and Jindal SAW as mandatory respondents for examination in its LTFV investigation.  See Antidumping Duty Investigation of Certain Oil Country Tubular

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

Goods from India: Respondent Selection at 5, PD 57, bar code 3151642-01 (Aug. 26, 2013).[2]

On February 18, 2014, Commerce issued its preliminary determination. <u>See Certain Oil Country Tubular Goods From India</u>, 79 Fed. Reg. 10,493 (Dep't Commerce Feb. 25, 2014) (preliminary determination of sales at less than fair value, preliminary affirmative determination of critical circumstances, in part, postponement of final determination) ("<u>Prelim. Results</u>"); <u>see also</u> Decision Memorandum for the Preliminary Determination in the Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from India, A-533-857, (Feb. 14, 2014), <u>available at</u> http://ia.ita.doc.gov/frn/summary/india/2014-04106-1.pdf (last visited April 17, 2016) ("Prelim. Decision Memo"). Commerce preliminarily determined that certain OCTG from India "are being, or are likely to be, sold in the United States at [LTFV]." <u>Prelim. Determination</u>, 79 Fed. Reg. at 10,493. Commerce preliminarily granted GVN a duty drawback for exports through the Advance License Program ("ALP") offered through the Indian government. <u>Id.</u> at 14. Commerce applied the mixed alternative methodology of its differential pricing analysis (i.e., average-to-transaction ("A-T") methodology to Jindal SAW's U.S. sales passing the Cohen's *d* test) to calculate the weighted-average dumping margins for Jindal SAW and calculated GVN's weighted-average dumping margin using the average-to-average ("A-A") methodology for all sales. <u>See</u> Prelim. Decision Memo at

---

[2] On December 19, 2014, Defendant submitted an appendix to the administrative record, which can be found at ECF No. 22-1. All further references to documents from the administrative record may be located in that appendix.

12.  As a result, Commerce preliminarily assigned weighted-average dumping margins of 55.29% to Jindal SAW, 0.00% to GVN, MSL, and JPL, and an all others rate of 55.29%. See Prelim. Determination, 79 Fed. Reg. at 10,494.

In its final determination, issued July 11, 2014, Commerce continued to grant GVN its requested duty drawback under the ALP.  See Final Decision Memo at 15.  Commerce had relied upon GVN's submitted cost of production ("COP") data in its preliminary determination, but in its final determination Commerce assigned GVN's N/L-80 grade sales of OCTG the highest costs associated with L-80 grade products because cost data for N/L-80 products was missing from GVN's cost database and Commerce's practice is to assign costs of products meeting the strictest performance requirements where such cost information is not reported by a respondent.  See id. at 30.  Commerce continued to apply the mixed alternative methodology to calculate the weighted-average dumping margin for Jindal SAW and the A-A methodology to all of GVN's sales in its final results. See Final Decision Memo at 12; see also Final Determination, 79 Fed. Reg. at 41,981. Therefore, Commerce assigned a weighted average dumping margin of 9.91% to Jindal SAW, 2.05% to GVN, MSL, and JPL, and an all others rate of 5.79%.  See Final Determination 79 Fed. Reg. at 41,982.

U.S. Steel challenges Commerce's determination: (1) to apply the ratio test within its differential pricing analysis, Br. Pl. United States Steel Corporation Supp. Mot. J. Agency R. Confidential Version 65–74, ECF No. 31, Mar. 23, 2015 ("U.S. Steel Br."); (2) that Jindal SAW was not affiliated with certain suppliers, id. at 15–31; (3) to use Jindal SAW's reported yield losses rather than partially applying adverse facts available ("AFA")

to those costs,[3] id. at 31–39; (4) to grant GVN a duty drawback adjustment, id. at 39–44; (5) to collapse GVN with affiliated producers MSL and JPL, id. at 45–56; and (6) that MSL and JPL's home market sales of OCTG only included one level of trade.  Id. at 56–65. Maverick adopts U.S. Steel's arguments.  Maverick Mot. 1.  GVN Plaintiffs challenge what they characterize as Commerce's apparent application of AFA to fill gaps in its reporting of COP for dual grade merchandise as contrary to law.  Mem. P. & A. Supp. Consolidated Pls.' Rule 56.2 Mot. J. Agency R. 10–17, Mar. 23, 2015, ECF No. 32-1 ("GVN Plaintiffs Br.").  Defendant, United States ("Defendant"), responds that the court should deny the motions of Plaintiff and Consolidated Plaintiffs and sustain Commerce's Final Results in full.  See Def.'s Corrected Resp. Opp. Pls.' and Pl.-Intervenors' Mots. J. Administrative R. Proprietary Version 2, Sep. 30, 2015, ECF No. 58 ("Def.'s Resp. Br.").  In addition, U.S. Steel filed a response, as defendant-intervenor, in opposition to the motion of GVN Plaintiffs.  See Mem. United States Steel Corporation Opp. Mot. J. Agency R. Filed By Pls. GVN Fuels Limited, Maharashtra Seamless Limited, and Jindal Pipes Limited Confidential Version, Sep. 21, 2015, ECF No. 49 ("U.S. Steel Resp. Br.").

For the reasons that follow, the court sustains Commerce's determinations: (1) granting GVN a duty drawback adjustment under the advance license export program operated by the Indian government; (2) collapsing GVN with MSL and JPL, its affiliated

---

[3] Although 19 U.S.C. § 1677e(a)–(b) (2012) and 19 C.F.R. § 351.308(a)–(c) (2013) each separately provide for the use of facts otherwise available and the subsequent application of an adverse inference to those facts, Commerce uses the shorthand term "adverse facts available" or "AFA" to refer to Commerce's use of such facts otherwise available with an adverse inference. See, e.g., Final Decision Memo at 38 (discussing the circumstances where the statute permits Commerce to apply AFA to uncooperative companies).

producers; and (3) finding that all of MSL and JPL's home market sales occurred within the same level of trade.  However, the court remands Commerce's determination with respect to its differential pricing analysis, specifically Commerce's application and explanation of its ratio test in this case, for further explanation and consideration.  Further, the court remands Commerce's determinations for further explanation and consideration that: (1) Jindal SAW was unaffiliated with certain suppliers of inputs; (2) Jindal SAW's yield loss data reasonably reflected its costs of production; and (3) the highest COP in GVN's cost database should be assigned to its dual-grade products.  The court defers its decision on U.S. Steel's claim that Commerce acted contrary to law in declining to apply partial AFA to Jindal SAW's reported yield loss data.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c) (2012),[4] which grant the court authority to review actions contesting the final determination in an ADD investigation.  The court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

## I.     Commerce's Use of the Ratio Test in its Differential Pricing Analysis

U.S. Steel challenges Commerce's use of the ratio test in its differential pricing analysis as inconsistent with the statute and Commerce's own practice.  U.S. Steel Br.

---

[4] Further citations are to the relevant provisions of Title 28 of the U.S. Code, 2012 edition unless otherwise noted.

65.   U.S. Steel argues that the thresholds used generally in the ratio test portion of Commerce's differential pricing analysis are arbitrary, see id. at 68, and that Commerce has never provided a reasoned explanation for these thresholds.  Id. at 69–70.  Further, U.S. Steel argues that Commerce's ratio test is unreasonably applied in this investigation. See id. at 72.  In response, Defendant argues that Commerce acted within its statutory authority to reasonably fill statutory gaps left by Congress to establish its differential pricing methodology, and that Commerce properly applied that methodology.  Def. Resp. Br. 33–34; 35–39.  The court finds that, although Commerce has considerable discretion to decide when to apply an alternative methodology to calculate dumping margins for respondents, it failed to adequately explain why the thresholds it has developed as part of the ratio test in its differential pricing methodology were reasonably applied in this investigation.

To determine whether merchandise is being sold in the United States at less than fair value and, if so, to calculate the ADD rate for the individually examined exporters and producers, Commerce must compare normal value to the export price of each entry of subject merchandise.[5]  See 19 U.S.C. § 1675(a)(2)(A)(ii); 19 U.S.C. § 1677b(a); 19 U.S.C. § 1677(35)(A).   The statute provides that Commerce shall ordinarily use the A-A

---

[5] Commerce calculates a respondent's dumping margin by determining "the amount by which the normal value exceeds the export price of the subject merchandise."  19 U.S.C. § 1677(35)(A).

methodology[6] to calculate dumping margins in an investigation, but Commerce may use

the A-T methodology[7] as an alternative to the default A-A method if:

> (i)    there is a pattern of export prices . . . for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and
>
> (ii)   [Commerce] explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) [(A-A)] or (ii) [(transaction-to-transaction)].[8]

19 U.S.C. § 1677f-1(d)(1)(B).  The statute provides no methodology for how Commerce

shall identify and measure a pattern of export prices, how significantly those prices must

differ among purchasers, regions, or periods of time, or what form of "export prices"

Commerce must consider in its pattern analysis.  See id. § 1677f-1(d)(1)(B)(i).  Commerce

has implemented and continues to develop a practice, which it calls its differential pricing

analysis, "for purposes of examining whether to apply an alternative comparison method

in this LTFV investigation."[9]  Prelim. Decision Memo at 10.

---

[6] The A-A methodology "involves a comparison of the weighted average of the normal values with the weighted average of the export prices . . . for comparable merchandise."  19 C.F.R. § 351.414(b)(1) (2013).

[7] The A-T methodology "involves a comparison of the weighted average of the normal values to the export prices . . . of individual transactions for comparable merchandise."  19 C.F.R. § 351.414(b)(3) (2013).

[8] Commerce's regulations echo this preference, providing that Commerce will apply A-A to calculate dumping margins in investigations unless another method is appropriate in a particular case.  See 19 C.F.R. § 351.414(c)(1) (2013).  Further citations to the Code of Federal Regulations are to the 2013 edition, unless otherwise noted.

[9] Commerce has developed its differential pricing analysis to evaluate whether the conditions for the A-T exception are met in an investigation.  Commerce first announced this approach, and coined the term "differential pricing analysis" in the ADD investigation of xanthan gum from the People's Republic of China.  See Xanthan Gum From the People's Republic of China, 78 Fed. Reg. 33,351, 33,351–52 (Dep't Commerce June 4, 2013) (final determination of sales at LTFV).

(footnote continued)

The court affords Commerce significant deference in determinations "involv[ing] complex economic and accounting decisions of a technical nature." Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996). Despite Commerce's wide discretion, it "must cogently explain why it has exercised its discretion in a given manner," Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48–49 (1983). Fashioning a test to evaluate what constitutes a pattern under the statute is sufficiently complex and technical to warrant significant deference. See Fujitsu, 88 F.3d at 1039. Commerce's methodological approach must nevertheless be a "reasonable means of effectuating the statutory purpose" and its conclusions must be supported by substantial evidence in order to be afforded deference. Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137, 1139 (Fed. Cir. 1987).

Commerce's differential pricing analysis requires a finding of "a pattern of [export prices] . . . for comparable merchandise that differs significantly among purchasers, regions, or time periods." Prelim. Decision Memo at 10. "If such a pattern is found, then the [differential pricing] analysis evaluates whether such differences can be taken into account when using the [A-A] method to calculate the weighted-average dumping

---

Since Commerce first applied the differential pricing analysis in an ADD investigation, it has applied this approach for uncovering masked dumping. See, e.g., Silica Bricks and Shapes From the People's Republic of China, 78 Fed. Reg. 70,918 (Dep't Commerce Nov. 27, 2013) (final determination of sales at less than fair value); Circular Welded Carbon Steel Pipes and Tubes From Thailand, 78 Fed. Reg. 65,272 (Dep't Commerce Oct. 31, 2013) (final results of ADD administrative review; 2011-2012); Hardwood and Decorative Plywood From the People's Republic of China, 78 Fed. Reg. 58,273 (Dep't Commerce Sept. 23, 2013) (final determination of sales at less than fair value).

margin." Id. Regarding the mechanics of the application of its differential pricing analysis, Commerce explained that it first applied the Cohen's *d* test, as it has in other investigations, to measure the extent of the price "difference between the mean of a test group and the mean of a comparison group."[10] Id. at 11.

Next, Commerce's differential pricing analysis employed the ratio test, which "assesses the extent of the significant price differences for all sales as measured by the Cohen's *d* test." See id. Commerce described the mechanics of its ratio test as follows:

> If the values of sales to purchasers, regions, and time periods that pass the Cohen's *d* test accounts for 66 percent or more of the value of total sales, then the identified pattern of [export prices] . . . that differ significantly supports the consideration of the application of the [A-T] method to all sales as an alternative to the [A-A] method.  If the value of sales to purchasers, regions and time periods that pass the Cohen's *d* test accounts for more than 33 percent and less than 66 percent of the value of total sales, then the results support consideration of the application of an [A-T] method to those sales identified as passing the Cohen's *d* test as an alternative to the [A-A] method, an application of the [A-A] method to those sales identified as not passing the Cohen's *d* test.  If 33 percent or less of the value of total sales pass the Cohen's *d* test, then the results of the Cohen's *d* test do not support consideration of an alternative to the [A-A] method.

Id. However, Commerce explained that the Cohen's *d* test only evaluates sales where both the test and comparison groups have at least two observations and where the sales

---

[10] "The Cohen's *d* coefficient is used to evaluate the extent to which the net prices to a particular purchaser, region or time period differ significantly from the net prices of all other sales of comparable merchandise."  Prelim. Decision Memo at 11.  Commerce considers test group sales to pass the Cohen's *d* test if the resulting Cohen's *d* coefficient is equal to or greater than 0.8, which Commerce deems to be a strong indication of significant price differences. Id.  Conversely, Commerce views a Cohen's *d* coefficient value of less than 0.8 as indicating that the price differences are not significant. Id.
      However, "sales passing the Cohen's *d* test do not, in and of themselves" establish that there is a pattern of export prices that differ significantly among purchasers, regions or period of time. See Final Decision Memo at 9; see also 19 U.S.C. § 1677f-1(d)(1)(B)(i).

quantity for the comparison group accounts for at least five percent of the total sales

quantity.  See id.  Commerce further explained that the value of sales that pass the

Cohen's *d* test, which is the numerator for the ratio test, only includes the sales that are

evaluated.  See id.  Yet, Commerce further explained that in this investigation, when

> accumulating the results of the Cohen's *d* test under the ratio test, these
> results must be considered with respect to all U.S. sales and not a subset
> of respondent's U.S. sales.  If the Department is unable to evaluate some
> sales then it simply cannot find these sales contributed to a pattern of prices
> that differ significantly, as required by the statute.

Final Decision Memo at 13.  Thus, as Commerce described its application of the ratio test

the denominator includes all sales, not just those that pass the Cohen's *d* test although

some sales may be excluded from the numerator.  See id.

In the final step of its differential pricing analysis, if the results of the Cohen's *d* test

and the ratio test "demonstrate the existence of a pattern of [export prices] . . . that differ

significantly," Commerce examines "whether using only the [A-A] method can

appropriately account for such differences."  Prelim. Decision Memo at 11.  It does so by

comparing the weighted average dumping margin obtained through the A-A method

versus that obtained through using the A-T method.  See id.  "If the differences between

the two calculations is meaningful," Commerce presumes that the A-A method cannot

account for the differences.[11]  Id.  In such circumstances, Commerce considers using A-

T appropriate.  Id.

---

[11] Commerce considers a difference in the weighted average dumping margins meaningful if:

> (1) there is a 25 percent relative change in the weighted-average dumping margin

(footnote continued)

After applying its differential pricing analysis, Commerce preliminarily found "that 60.68 percent of Jindal SAW's U.S. sales pass the Cohen's *d* test, and confirm the existence of a pattern of export prices . . . for comparable merchandise that differ significantly among purchasers, regions or time periods." Id. at 10.   Notwithstanding Commerce's pattern finding, Commerce elected to apply its A-A methodology to all of Jindal SAW's U.S. sales because it found no "meaningful difference in the weighted-average dumping margins when calculated using the [A-A] method and an alternative method based on the [A-T] method applied to all U.S. sales which pass the Cohen's *d* test." Id.  With regard to GVN's U.S. sales, Commerce preliminarily determined to use its A-A methodology for all transactions because Commerce found "that 22.54 percent of GVN's U.S. sales pass the Cohen's *d* test and therefore the analysis does not confirm the existence of a pattern of export prices . . . for comparable merchandise that differ significantly among purchasers regions or time periods." Id. at 12.

In its final determination, Commerce rejected U.S. Steel's objections that its application of the ratio test of its differential pricing analysis was unreasonable or unlawful. See Final Decision Memo at 9.  As it had in its preliminary determination, Commerce applied its A-T methodology to Jindal SAW's sales passing the Cohen's *d* test because Commerce asserted that the statute gave it the discretion to determine how it "should measure whether there is a pattern of [export prices] that differed significantly or how the

---

between the [A-A] method and the appropriate alternative method where both rates are above the *de minimis* threshold, or (2) the resulting weighted-average dumping margin moves across the *de minimis* threshold.
Prelim. Decision Memo at 11–12.

[A-T] method may be applied as an alternative to the standard [A-A] method."  See Final

Decision Memo at 10 (referencing SAA, H.R. Doc. No. 103-316 (1994), reprinted in 1994

U.S.C.C.A.N. 4040); see also Prelim. Decision Memo at 10–12.  Commerce found that

"24.14 percent of GVN's sales pass the Cohen's *d* test, which does not confirm the

existence of a pattern of prices that differ significantly."  Final Decision Memo at 12.

Accordingly, Commerce applied the A-A method to all of GVN's U.S. sales.  Id.

> In applying the ratio test, Commerce continued that it
>
> finds reasonable, given its growing experience of applying [the statute] and the application of the [A-T] method as an alternative to the [A-A] method, that when two thirds or more of a respondents sales are at prices that differ significantly, then the extent of these sales is so pervasive that it would not permit the Department to separate the effect of the sales where prices differ significantly from those where prices do not differ significantly.  . . .  Finally, when the Department finds that between one third and two thirds of U.S. sales are at prices that differ significantly, then there exists a pattern of prices that differ significantly, and the effect of this pattern can reasonably be separated from the sales whose prices do not differ significantly. Accordingly, in this situation, the Department finds that it is appropriate to address the concern of masked dumping by considering the application of the [A-T] method as an alternative to the [A-A] method for only those sales which constitute the pattern of prices that differ significantly.

Id. at 11.  In addition, Commerce continued to decline to exclude sales for which

comparisons were not made in the Cohen's *d* test from the denominator of its ratio test.

Id.

Initially, U.S. Steel argues that, even if Commerce has reasonably filled the gaps

in the statute by developing the ratio test, the ratio test is inconsistent with Commerce's

past practice.  See U.S. Steel Br. 67–68.  However, all of the proceedings cited by U.S.

Steel involve Commerce's application of the *Nails* test to determine whether respondents

were engaged in targeted dumping.[12]   Commerce explained that its "approach in this

matter has changed over time as the Department has gained experience in examining

whether the [A-T] method is an appropriate method."   Final Decision Memo at 10.

Commerce's explanation is reasonable and sufficient.   Therefore, Commerce was not

obliged to follow its practice under the *Nails* test, see NMB Singapore Ltd. v. United

States, 557 F.3d 1316, 1328 (Fed. Cir. 2009), and U.S. Steel's argument that

Commerce's use of the ratio test conflicts with its practice under the *Nails* test does not

undermine Commerce's authority to apply its new practice.

Nonetheless, while Commerce has reasonably explained why its differential

pricing methodology is generally tailored to the statutory purpose, see State Farm, 463

U.S. at 48–49, Commerce has failed to adequately explain why its thresholds as applied

in this investigation are reasonable.   U.S. Steel argues that the effect of Commerce's

practice of limiting the application of the Cohen's *d* test to sales where the test and

comparison groups have at least two observations *was* to exclude over [[   ]]% of the

value of GVN's sales and almost [[   ]]% of the value of Jindal SAW's sales from testing

---

[12] In 2008, Commerce began using what is now referred to as the *Nails* test in investigations to determine if a foreign exporter or producer is engaging in targeted dumping.   See generally Certain Steel Nails From the People's Republic of China, 73 Fed. Reg. 33,977 (Dep't Commerce June 16, 2008) (final determination of sales at LTFV); Certain Steel Nails From the United Arab Emirates, 73 Fed. Reg. 33,985 (Dep't Commerce June 16, 2008) (notice of final determination of sales at not LTFV); see also Mid Continent Nail Corp. v. United States, 34 CIT 512, 513–15, 712 F. Supp. 2d 1370, 1372–74 (2010).   For several years Commerce used the *Nails* test to help decide whether the statutory preconditions are satisfied to employ the A-T methodology.   On March 4, 2013, Commerce shifted its approach, departing from its previous targeted dumping analysis, and it first used its differential pricing analysis in the ADD investigation of xanthan gum from the People's Republic of China.   See Xanthan Gum From the People's Republic of China, 78 Fed. Reg. 33,351, 33,351–52 (Dep't Commerce June 4, 2013) (final determination of sales at LTFV).

under Commerce's differential pricing analysis.  See U.S. Steel Br. 72.  Here, Commerce

has relied exclusively on its thresholds developed for different circumstances, i.e., where

a significant value of sales is not excluded from testing.  See Prelim. Decision Memo at

11; Final Decision Memo at 11.  Commerce must explain why its ratios are reasonable

even though a significant value of respondents' sales were excluded.

    If the denominator of Commerce's ratio test (i.e., the value of all of respondents'

sales) remains constant, then the ratio of the value of sales passing the Cohen's $d$ test

relative to the value of all sales may differ substantially from another investigation where

a lesser value of sales is excluded from application of the Cohen's $d$ test.  Because the

breadth of Commerce's application of its A-T methodology is significantly determined by

the ratio of the value of export sales that pass the Cohen's $d$ test to the value of all export

sales, Commerce could not rely upon its explanation for the thresholds developed in

investigations where such a significant value of respondents' sales were not excluded

from the numerator without explaining why these ratios were reasonable in circumstances

where a significant value of sales were excluded.  If two otherwise similar investigations

identified similar patterns of prices that differed by purchaser, region, or time period, the

results of Commerce's differential pricing analysis may differ significantly if, in one

investigation, a significant value of sales is excluded from Commerce's ratio analysis.

This result has at least the potential to treat the same behavior differently.  Given the

value of sales excluded from the analysis here, the court remands Commerce's

determination to provide further explanation as to why its thresholds as applied in this

investigation are reasonable or otherwise reconsider the parameters of its differential pricing methodology in such contexts.[13]

As a separate argument, U.S. Steel asks the court to read the statute as requiring the application of the A-T methodology to all sales.  See U.S. Steel Br. 66–67.  Citing the SAA, U.S. Steel argues that "[t]he SAA does not require – or even suggest – that there is any precondition to applying the A-T methodology beyond" those contained in the statute. See U.S. Steel Br. 66 (citing SAA, H.R. Doc. No. 103-316, vol. 1 at 843, reprinted in 1994 U.S.C.C.A.N. at 4178).  But this argument presumes that the statute does not delegate to Commerce the question of when and to what extent the A-T methodology should be employed once the statutory preconditions for application of A-T have been satisfied. U.S. Steel claims that Congress's intent was to apply the A-T methodology to as many sales as possible.  See U.S. Steel Br. 66.  Yet, the statute, the regulation, and the SAA all express that the A-A methodology will be the default rule and A-T the exception.  See 19 U.S.C. § 1677f-1(d)(1)(B); 19 C.F.R. § 351.414(c) (2013); SAA, H.R. Doc. No. 103-316, vol. 1 at 843, 1994 U.S.C.C.A.N. at 4178.  If Congress had had such an intent, it knew how to convey it in the language of the statute.[14]  The provision of the SAA cited by

---

[13] U.S. Steel argues that, "[t]o the extent Commerce is allowed to continue to employ the ratio test in its differential pricing analysis, [the court] should direct the agency to use the total value of sales that are subject to the Cohen's *d* test as the denominator of the calculation used in the ratio test." U.S. Steel Br. 72–73.  The court declines to mandate that Commerce implement U.S. Steel's suggested remedy, and leaves it to the agency to reconsider its determination in light of the court's decision.

[14] U.S. Steel's citation to Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States, 38 CIT __, __, 990 F. Supp. 2d 1384, 1389 (2014) for the proposition that the ratio test limits the application of A-T, which it argues runs contrary to the statute, is misplaced.  In Borusan

(footnote continued)

U.S. Steel is nothing more than a general explanation that the conditions recited in the statute govern Commerce's use of the A-T methodology.  See id.  No language in the statute explicitly indicates Congress mandated the application of A-T to all sales.  See 19 U.S.C. § 1677f-1(d)(1)(B).

U.S. Steel's arguments that the tiers established by Commerce's ratio test are arbitrary in a general sense are similarly unavailing.  See U.S. Steel Br. at 68–69.  So long as Commerce's rationale for adopting such thresholds is reasonably explained, the court's standard of review does not require that Commerce explain the statistical calculations and methodologies that allowed it to arrive at such thresholds.  See State Farm, 463 U.S. at 48–49; Ceramica Regiomontana, 10 CIT at 404–05, 636 F. Supp. at 966.  U.S. Steel's argument that "Commerce has not provided a reasoned basis why it cannot 'separate the effect' of differential pricing when 67% of sales are affected but it can make such a distinction where 65% of sales are affected," U.S Steel Br. at 70, amounts to nothing more than a general philosophical criticism of the concept of a threshold.  See U.S. Steel Br. at 68–69.  It is inherent in the concept of a threshold that observations that fall on the margins of either side will be treated disparately from those on the other side.  Such a criticism would no less apply if Commerce had set its threshold

---

Mannesmann, the plaintiff argued that Commerce was required to discern that the respondents had acted purposefully in finding targeted dumping.  See Borusan Mannesmann, 38 CIT at __, 990 F. Supp. 2d at 1387.  The court held that neither the statute nor the SAA imposed any such requirement.  Id. at __, 990 F. Supp. 2d at 1389.  Similarly, Nippon Steel Corp. v. United States, 337 F.3d 1373 (Fed. Cir. 2003), also cited by U.S. Steel, see U.S. Steel Br. at 67, merely held that the statutory provision allowing Commerce to adopt an adverse inference when using information otherwise available for a non-cooperating respondent does not have an intent requirement.  See Nippon Steel Corp., 337 F.3d at 1383 (Fed. Cir. 2003).

at 33% as it would at 66%.  So long as Commerce has explained its rationale behind such a threshold, the court will defer to Commerce's significant statistical and economic expertise in fashioning it.  See Fujitsu, 88 F.3d at 1039.

Commerce has explained that "when a third or less of a respondent's U.S. sales are not at prices that differ significantly, then these significant price differences are not extensive enough to satisfy the first requirement of the statute," which requires Commerce to find a pattern of export prices for comparable merchandise that differ significantly among purchasers, regions or period of time.  See Final Decision Memo at 11.  Likewise, "when two thirds or more of a respondent's sales are at prices that differ significantly, then the extent of these sales is so pervasive that it would not permit the Department to separate the effect of the sales where prices differ significantly from those where prices do not differ significantly."  Id.  Additionally, when Commerce finds that "between one third and two thirds of U.S. sales are at prices that differ significantly, then there exists a pattern of prices that differ significantly, and the effect of this pattern can reasonably be separated from the sales whose prices do not differ significantly."  Id.  The court can discern from Commerce's explanation that Commerce has developed its ratio test to identify the existence and extent to which there is a pattern of export prices for comparable merchandise that differ significantly among purchasers, regions or periods of time.  U.S. Steel fails to show that Commerce's ratio test fails to reveal such a pattern that in fact exists.

**II.      Claims Relating to Mandatory Respondent Jindal SAW**

      **A.      Affiliation of Jindal SAW with Suppliers of Inputs**

      U.S. Steel argues that Commerce lacked substantial evidence for finding Jindal SAW unaffiliated with its suppliers of steel billets and electricity, the primary inputs for producing subject merchandise.  U.S. Steel's Br. 25.  U.S. Steel argues that Commerce ignored evidence that Jindal SAW's two suppliers: (1) "are under the common control of the O.P. Jindal Family and Group and are affiliated," id. at 13; (2) "[t]he O.P. Jindal family, through the O.P. Jindal Group, exercises control over Jindal SAW [and its suppliers of steel billets and electricity] due to family relationships, stock ownership, and a close supplier relationship," id. at 18; and (3) "these 'members of [the family] . . . and lineal descendants' hold the top leadership positions in each flagship company that makes up the O.P. Jindal Group," id. at 19.  Lastly, U.S. Steel asserts that "[t]he O.P. Jindal family exercise control over Jindal SAW [and its suppliers of steel billets and electricity] by way of stockholdings in all three companies that [[                                   ]] the 5% threshold established in the statute."   Id. at 22–23.  Defendant argues that U.S. Steel's claims depend on a "skewed reading of the record" and that Commerce "reasonably based its determinations on record evidence."  Def.'s Resp. Br. at 11.  The court finds that, given the record evidence of indirect ownership and close supplier relationships, Commerce has failed to adequately explain why it was reasonable to conclude that Jindal SAW and its suppliers of steel billets and electricity were not under the common control of the O.P. Jindal family.   Therefore, the court remands this issue to Commerce for further consideration and explanation.

The statute defines affiliated persons through the following categories:

(A) Members of a family, including brothers and sisters (whether by whole or half blood), spouse ancestors, and lineal descendants.
(B) Any officer or director of an organization and such organization.
(C) Partners.
(D) Employer and Employee.
(E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.
(F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.
(G) Any person who controls any other person and such other person.

19 U.S.C. § 1677(33).[15]   Commerce's regulations incorporate the statutory definition of

"affiliated persons" and "affiliated parties" and further clarify the non-exhaustive list of

considerations Commerce shall take into account in assessing whether control over

another person exists as an element of affiliation.   19 C.F.R. § 351.102(b)(3).   In

evaluating whether control exists within § 1677(33), Commerce will consider "[c]orporate

or family groupings; franchise or joint venture agreements; debt financing; and close

supplier relationships."   Id.   However, Commerce "will not find that control exists on the

---

[15] In its brief, U.S. Steel asserts that, in addition to category (F), Jindal SAW and its suppliers of steel billets and electricity should be considered affiliated under categories (A),(B), and (E).  U.S. Steel's Br. 16; see also 19 U.S.C. § 1677(33).  At oral argument, citing Dongkuk Steel Mill Co. v. United States, 29 CIT 724 (2005) and Ferro Union, Inc. v. United States, 23 CIT 178, 44 F. Supp. 2d 1310 (1999), U.S. Steel argued that the statute permits Commerce to consider members of a family that are affiliated with one another under § 1677(33)(A) as a person who may directly or indirectly control or be under common control with other persons under § 1677(33)(F).  See Conf. Oral Arg., 00:26:33–00:27:30, Mar. 3, 2016, ECF No. 94.  Although U.S. Steel contended that affiliation under § 1677(33)(A),(B), and (E) provided additional context for breaking down why there is common control, see id. at 00:06:10-00:06:13, it conceded that the basis for finding Jindal SAW affiliated with its suppliers of steel billets and electricity is § 1677(33)(F).  See id. at 00:06:14-00:06:20.  Therefore, the court restricts its review to whether Commerce's determination that Jindal SAW and its suppliers of steel billets and electricity were under the common control of the O.P. Jindal family was supported by substantial evidence.

basis of these factors unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of subject merchandise." Id. Under Commerce's practice, in cases involving control through corporate or family groupings, Commerce has noted that the control factors of individual members of the group are considered in the aggregate. See, e.g., Issues and Decision Memorandum for the Final Results of the 2001-2002 Administrative Review of the Antidumping Duty Order on Steel Concrete Reinforcing Bar from the Republic of Korea, A-580-844, (Apr. 13, 2004), available at http://ia.ita.doc.gov/frn/summary/korea-south/04-8375-1.pdf (last visited Apr. 17, 2016).

Commerce must further explain its determination that Jindal SAW and its suppliers of steel billets and electricity were not directly or indirectly under the common control of members of the O.P. Jindal family under § 1677(33)(F). Defendant does not dispute that Commerce's regulation requires that it evaluate family groupings and supplier relationships in determining whether control exists under §§ 1677(33)(F). See Def.'s Resp. Br. 15; see also 19 C.F.R. § 351.102(b)(3). Nor does Defendant dispute that Commerce's practice is to evaluate the control factors of individual members of the family grouping (e.g. stock ownership, management positions, board membership) in the aggregate. See Def.'s Resp. Br. 15–16. Indeed, Commerce did investigate the aggregated direct interests of O.P. Jindal family members as well as the O.P. Jindal family members' board positions in various O.P. Jindal Group entities. See Verification of the Cost Response of Jindal SAW Limited in the Antidumping Duty Investigation of Oil Country Tubular Goods ("OCTG") from India at 5–7, CD 343, bar code 3195642-01 (Apr.

14, 2014) ("Jindal SAW Cost Verification Report").  However, Commerce did not evaluate the collective stock ownership (including indirect stock ownership), management positions, and board memberships held by O.P. Jindal family members in Jindal SAW, JSPL, and [[                ]] as its practice requires.  Commerce failed to explain why it deviated from its practice here.

Commerce acknowledged that the relatedness of the members of the O.P. Jindal family.  Prelim. Decision Memo at 6.  Likewise, Commerce acknowledged the existence of corporate groupings and close supplier relationships among Jindal SAW and its suppliers, noting that

> [a]ccording to the record, the respondents are members of two "informal" groups of companies associated with the Jindal family.  These two groups originated with two brothers: Mr. O.P. Jindal (now deceased) and Mr. B.C. Jindal.  Mr. B.C. Jindal's son, Mr. D.P. Jindal, then separated from his father and created a third group of companies, "the D.P. Jindal group."  Jindal SAW belongs to the O.P. Jindal group . . . .  The O.P. Jindal group includes suppliers of inputs used by the OCTG producers in all three groups.

Id.  However, without examining the family's management positions and board memberships, Commerce's examination of the collective direct stock ownership of O.P. Jindal family members alone was insufficient to reasonably conclude that the family was not legally or operationally in a position to exercise restraint or direction over Jindal SAW, JSPL, and [[                ]].  This was particularly true in light of record evidence indicating that the O.P. Jindal family may have had the capacity to exercise control through the promoter groups of these entities.[16]

---

[16] "Promoter" is a term of art under Indian securities law.  It includes:

(footnote continued)

With respect to Jindal SAW, Commerce reviewed the following individual direct holdings of each of the four sons of O.P. Jindal: P.R. Jindal ([[     ]]%), Sajjan Jindal ([[     ]]%), Naveen Jindal ([[     ]]%), and Rattan Jindal ([[     ]]%).  See Jindal SAW Cost Verification Report at 5–6.  However, Commerce limited its examination of the family's indirect holdings in Jindal SAW to reviewing the family's holdings of [[

                                              ]], the largest shareholder in Jindal SAW.  See id. at 6.  Commerce justified its limited examination of indirect holdings by explaining that the other ten largest shareholders in Jindal SAW were not publicly traded, so Commerce was unable to obtain a list of shareholders of those entities.  See id.  Commerce determined that the aggregated direct holdings of Jindal family members in [[               ]] was [[     ]]%.  Id. at 6.  In its Jindal SAW Cost Verification Report, Commerce made no finding regarding the aggregate total direct and indirect holdings of the O.P. Jindal Family in Jindal SAW.  See id. at 6.  Nor did Commerce trace the aggregated direct and indirect holdings of the O.P. Jindal family members in either JSPL or [[               ]].  See id. at 6.

---

<p style="margin-left:2em;">
(i)     the person or persons who are in control of the issuer;<br>
(ii)    the person or persons who are instrumental in the formulation of a plan or programme pursuant to which specified securities are offered to the public;<br>
(iii)   the person or persons named in the offer documents as promoters.
</p>

U.S. Steel Deficiency Comments on Jindal SAW's Questionnaire Response at Ex. F at 5, PD 167–171, bar codes 3167500–01 through 3167500–05 (Dec. 9, 2013).  Likewise, "promoter group" is a term of art under Indian securities law defined as including the promoter and individuals and corporations with various relationships to the promoter, which may include family relationships and holding of equity shares in the promoter at varying thresholds.  Id.

U.S. Steel cites record evidence in a Jindal SAW financial prospectus that Jindal SAW's promoters were P.R. Jindal, the Jindal Family, and persons or entities controlled by them (directly or indirectly).   U.S. Steel Reply Br. 6 (citing U.S. Steel Deficiency Comments on Jindal SAW Questionnaire Response at Ex. G, PD 167–171, bar codes 3167500-01–05 (Dec. 6, 2013) ("U.S. Steel Comments Jindal SAW Questionnaire Response")).   U.S. Steel also noted at oral argument that the prospectus limits the promoters of Jindal SAW to P.R. Jindal, his family members, and entities that they control. <u>See</u> Conf. Oral Arg., 00:20:47–00:20:56, Mar. 3, 2016, ECF No. 94 ("Conf. Oral Arg."); <u>see also</u> U.S. Steel Comments Jindal SAW Questionnaire Response at Ex. G.  U.S. Steel cites additional information, albeit at times from slightly outside the period of review, that the promoters and promoter groups of each of Jindal SAW, JSPL, and [[                 ]] collectively held significant percentages of the total shareholdings in each entity relative to non-promoter group shareholders.   <u>See</u> Conf. Oral Arg. 00:21:23–00:26:27 (citing Jindal SAW Cost & Sales Verification Exhibits at Ex. 4, CD 260–295, bar codes 3190334-01–05 (Mar. 25, 2014); U.S. Steel Supplemental Comments Jindal SAW Questionnaire Response at 177, 181, CD 216, bar code 3181479-02 (Feb. 14, 2014)).

In light of this record evidence indicating that O.P. Jindal family members controlled the promoter groups and the fact that the statute requires Commerce to look at indirect holdings, Commerce must explain why it was reasonable for it to conclude that O.P. Jindal's indirect holdings through promoter groups were not significant enough to indicate control.  The fact that Commerce did not specifically refer to the direct or indirect

holdings of any O.P. Jindal family member in either JSPL or [[                    ]] underscores the unreasonableness of Commerce's conclusion given the record evidence.

Moreover, although Commerce traced the board memberships and management positions of Jindal family members in Jindal SAW, JSPL, and [[                    ]], Commerce failed to explain why it was reasonable to conclude that these memberships and positions did not create the potential to impact decisions concerning production, pricing, and cost of subject merchandise, or indicate that the O.P. Jindal family was not in a position to exercise restraint and direction over all of these entities.  Commerce recognized that P.R. Jindal is the Chairman of Jindal SAW, see Jindal SAW Cost Verification Report at 4, and that "Indresh Batra (husband of and Sminu Jindal) holds the position of Managing Director of Jindal SAW.  [It] noted from a review of the Annual Reports of the other companies that . . . Mr. Ratan Jindal, brother of P.R. Jindal, is the Chairman and Managing Director of [JSPL]."  Id. at 7.

Commerce discounted the control significance of these board memberships and management positions because "none of the Jindal brothers (i.e., P.R. Jindal, Sa[j]jan Jindal, Ratan Jindal or Naveen Jindal) appears as a director of another brother's company nor do they hold a management position in another brother's company."  Id.  Although Commerce recognized that Savitri Jindal sat on the boards of both Jindal SAW and JSPL, it failed to explain why it attached no control significance to this fact, nor did it explain why her presence on boards of both companies did not detract from its other control findings. Further, U.S. Steel pointed to record evidence that Sajjan Jindal is the Chairman and Managing Director of [[          ]].  U.S. Steel Br. 2 (citing Jindal SAW Section A

Response at Ex. A-4, PD 93–104, bar codes 3159648-1–12 (Oct. 24, 2013)).  Commerce, however, did not make findings as to the board composition and memberships in Jindal SAW's electricity supplier.

Commerce also relied on the fact that Jindal SAW's Articles of Association provided that "each director has a single vote and the Board may only take action with a majority of the votes except in case of a tie where the Chairman may place a tie-breaking vote," to discount the control significance of the board membership and management positions of the various Jindal family members.  Jindal SAW Cost Verification Report at 7.  However, Commerce did not investigate voting patterns or the existence of voting trust agreements that could impact the Jindal family's ability to take action notwithstanding its non-majority status on the board of Jindal SAW.  See id.  In order for its control findings to be supported by substantial evidence, on remand Commerce must explain why its conclusion was reasonable in light of the detracting evidence relating to board memberships and management positions of the various Jindal family members.

Commerce also failed to evaluate the nature of supplier relationships in its final determination, which Commerce's regulation provides it will consider among the factors in evaluating a relationship of control within its affiliation determination.  See 19 C.F.R. § 351.102(b)(3).[17]  Where Commerce finds that a close supplier relationship "has the

---

[17] At oral argument, in response to the court's question as to whether Commerce considered the supplier relationship between JSPL and Jindal SAW and seeking an explanation of why it did not favor a determination that Jindal SAW was affiliated with JSPL or [[            ]], see Confidential Letter from Court to Parties Concerning Questions for Oral Argument 7–8, Jan. 28, 2016, ECF No. 80, Defendant conceded that Commerce did not address the supplier relationship in its decision memorandum.  See Conf. Oral Arg., 00:43:35-00:43:39.  Defendant likewise conceded that Commerce's regulation lists supplier relationships as a factor.  Id. at 00:43:29–00:43:33.

potential to impact decisions concerning the production, pricing or costs" of such merchandise, Commerce may also find control sufficient to establish affiliation under § 1677(33). <u>See</u> 19 C.F.R. § 351.102(b)(3).[18]  U.S. steel cites record evidence indicating that Jindal SAW purchases approximately [[      ]]% of its steel billets from JSPL, U.S. Steel Br. 27 (citing Jindal SAW Supplemental Section D Questionnaire Response at Ex. D-16, CD 117–118, bar codes 3172116-01–02 (Jan. 6, 2014)).  This evidence suggests the relationship has the potential to impact production, pricing, or cost decisions. Therefore, Commerce must consider the close supplier relationships between Jindal SAW and JSPL and explain why it did not indicate the O.P. Jindal family controlled both Jindal SAW and JSPL.

Defendant argues that U.S. Steel points to "no evidence—such as an exclusive sales contract—that might demonstrate such reliance." Def.'s Resp. Br. 17.  Although a close supplier relationship may be an arm's length relationship, the regulation indicates that Commerce shall evaluate such a relationship and consider if the supplier has become reliant upon the buyer. <u>See</u> 19 C.F.R. § 351.102(b)(3); SAA, H.R. Rep. No. 103-316, vol. 1 at 838, 1994 U.S.C.C.A.N. at 4,175.  A legal obligation requiring one entity to purchase from the other, such as an exclusive sales contract, is not the only relationship that has the potential to impact decisions concerning the production, pricing or costs.  In fact, Commerce's practice, consistent with the SAA's definition of such a relationship, is to evaluate whether a buyer company has become reliant on the seller, or vice versa. <u>See</u>

---

[18] A close supplier relationship is one "in which the supplier or buyer becomes reliant upon the other."  SAA, H.R. Rep. No. 103-316, vol. 1 at 838, 1994 U.S.C.C.A.N. at 4,175.

Certain Cold-Rolled and Corrosion Resistant Carbon Steel Flat Products From Korea, 62 Fed. Reg. 18,404, 18,417 (Dep't Commerce Apr, 15, 2007) (final results of antidumping administrative reviews); see also SAA, H.R. Rep. No. 103-316, vol. 1 at 838, 1994 U.S.C.C.A.N. at 4,174–75.  Here, Commerce's analysis did not address these reliance considerations.

Defendant argues that after Commerce traced the indirect share ownership of O.P. Jindal family members in Jindal SAW, Commerce found "the record evidence did not provide a basis to impute control by the Jindal family through the promoter groups identified by U.S. Steel."  Def.'s Resp. Br. 16 (citing Jindal SAW Cost Verification Report at 5–7).  Defendant argues that U.S. Steel relies on promoter entities to support its indirect control argument, and U.S. Steel has not shown that the Jindal family's ownership in the promoter companies is significant.  See id. at 15.  Yet, Defendant's statement that Commerce searched publicly available databases of the Bombay Stock Exchange and the National Stock Exchange of India, and found no entity listed called the "O.P. Jindal Group," see id. at 15–16; see also Jindal SAW Cost Verification Report at 5, does not relieve Commerce from explaining how it could conclude the O.P. Jindal family did not control Jindal SAW, JSPL, and [[              ]].

Commerce failed to address the significance of the corporate and family relationships among the O.P. Jindal family members that held direct and indirect interests in Jindal SAW, JSPL, and [[              ]] as well as their roles as managers and directors of these companies.  Commerce also failed to analyze whether close supplier

relationships made Jindal SAW reliant on JSPL or [[                    ]], or vice versa. Therefore, the court remands Commerce for further consideration and explanation.

### B.    Commerce's Acceptance of Jindal SAW's Reported Yield Loss Data

U.S. Steel argues Commerce lacked substantial evidence to conclude that Jindal SAW's cost reporting methodology allocated yield losses on a basis that reasonably reflected differences in the processing costs for merchandise with differing physical characteristics. U.S. Steel Br. 31–32. To remedy such deficiencies in Jindal SAW's COP data, U.S. Steel argues Commerce should have applied AFA to Jindal SAW's yield losses. Id. at 37–39. In response, Defendant argues "Commerce verified the accuracy of Jindal SAW's yield loss methodology," and, in any event, Commerce reasonably refused to apply AFA because "Jindal SAW cooperated with Commerce's requests for information." Def.'s Resp. Br. 59. Commerce lacked substantial evidence for its conclusion that Jindal SAW's reported yield loss data reasonably reflected its COP for each specific category of subject merchandise.

Commerce generally "shall consider all available evidence on the proper allocation of costs . . . if such allocations have been historically used by the exporter or producer." Id. According to the statute,

> [c]osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise.

19 U.S.C. § 1677b(f)(1)(A). If Commerce determines that the records of the respondent cannot properly form an accurate basis upon which to calculate that respondent's COP,

then Commerce shall use facts otherwise available in reaching the determination.   19

U.S.C. § 1677e(a).   Commerce may apply AFA in selecting from among the facts

otherwise available where it "finds that an interested party has failed to cooperate by not

acting to the best of its ability to comply with [its] request for information."   19 U.S.C.

§ 1677e(b).

Commerce initially evaluates the respondent's COP data, as reported, to ensure

that the reported COP reporting methodology complies with generally accepted

accounting principles ("GAAP") of the exporting country.    See 19 U.S.C.

§ 1677b(f)(1)(A).[19]   Thereafter, Commerce evaluates whether a respondent's COP data,

as reported, "reasonably reflect[s] the costs associated with the production and sale of

the merchandise." 19 U.S.C. § 1677b(f)(1)(A).

The statute does not define what it means for reported cost information to

reasonably reflect that party's COP.   See 19 U.S.C. § 1677b(f)(1)(A).   The Court of

Appeals for the Federal Circuit has broadly defined when costs "reasonably reflect the

costs associated with the production and sale of the merchandise" to mean that the costs,

as reported would not distort the company's true costs.   Am. Silicon Techs. v. United

States, 261 F. 3d 1371, 1377 (Fed. Cir. 2001); see also 19 U.S.C. § 1677b(f)(1)(A).  Given

the record evidence before it, Commerce inadequately explained why Jindal SAW's yield

---

[19] U.S. Steel does not challenge that the cost data reported by Jindal SAW was kept in accordance with Indian GAAP.  Therefore, the court need not address whether Jindal SAW's yield losses satisfied the first prong of 19 U.S.C. § 1677b(f)(1)(A).

loss data reasonably reflected its COP.[20]

Commerce's determination to accept Jindal SAW's reported yield losses is not supported by substantial evidence.  Commerce's finding that Jindal SAW's books and records captured total yield loss [[

]] does not permit it to conclude that products with different physical characteristics generated [[       ]] yield losses, as Jindal SAW reported.  <u>See</u> Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – Jindal SAW at 7, PD 354, bar code 3215359-01 (Jul. 10, 2014) ("Jindal SAW Cost Calculation Memo").  Commerce concedes that Jindal SAW's yield loss allocation methodology allocated yield losses [[                    ]] production stages regardless of specific physical characteristics (i.e., wall thickness or diameter) of its product.  Final Decision Memo at 36, 40.  Commerce stated that, "[a]lthough yield is not calculated by production stage as advocated by the petitioners, we do not find evidence that the reported yield is unreasonable" because "reallocation of conversion costs after a certain proprietary production stage would result in an insignificant change in the reported costs and therefore the reported costs are reasonable."  <u>Id.</u> at 40.

---

[20] It is undisputed that, during the investigation, Commerce instructed Jindal SAW to report unique cost information in its cost database for each control number ("CONNUM") based on different physical characteristics Commerce identified in the subject merchandise.  <u>See</u> Final Decision Memo at 36; Def.'s Resp. Br. 62.  It is likewise undisputed that Commerce found that [[
                                                                                                              ]] of OCTG across different CONNUMs.  Final Decision Memo at 36; <u>see also</u> Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – Jindal SAW, PD 354, bar code 3215359-01 (Jul. 10, 2014).  Jindal SAW reported multiple CONNUMs with [[       ]] information.  <u>See</u> <u>id.</u> at 1–2.

Yet, Commerce cites to no record evidence to support its conclusion that such costs were [[      ]] distributed or that allocating such COP differently would have resulted in an insignificant change.  By comparison, Commerce measured whether Jindal SAW's conversion cost data was distorted by comparing two equal lengths of subject merchandise with different diameters and wall thicknesses that represented the largest production quantity in Jindal SAW's cost database.  Jindal SAW Cost Calculation Memo at 3.  Commerce then used length to weight conversion factors provided by Jindal SAW, and Commerce found that the difference between calculating costs on a [[

]] and on a [[                                    ]] resulted in a difference in allocated cost of [[   ]]%.  Id.  Based on this comparison, Commerce concluded that "the reported product specific conversion costs for the [[      ]] are inaccurate and unusable."[21]  Id. Commerce conducted no such comparison between yield losses allocated by physical characteristic or production stage versus costs [[                    ]] across all products with different physical characteristics or stages of production.  See id.  Since Commerce merely accepted Jindal SAW's reported yield losses without comparing costs, as it had with respect to conversion costs, Commerce could not have determined if this yield loss reporting methodology potentially distorted Jindal SAW's yield losses.  Therefore,

---

[21] Likewise, with respect to conversion costs at later stages of production, Commerce investigated whether the conflicting methodologies advocated by the parties would result in significant distortions to Jindal SAW's actual costs.  Again, Commerce did so by obtaining a reallocation of costs for three selected CONNUMs based on processing times it obtained at verification.  Id. at 7.  Commerce compared costs as reported to those after reallocation, and Commerce determined that its "testing showed that there were [[
]] Id.

Consol. Court No. 14-00263                                              Page 34

Commerce's determination that Jindal SAW's yield losses accurately reflected its COP
was not supported by substantial evidence.

Defendant argues that tracking yield losses by stage of production or CONNUM-
specific characteristics would result in the total yield losses reported by Jindal SAW over
the overall course of its production of subject merchandise.  See Def.'s Resp. Br. 61.  This
argument misses the point.  Even if Jindal SAW's total yield losses over its overall course
of production are accurately reported, Commerce has failed to explain, or to test, whether
the costs for two CONNUMs with different characteristics would have different yield
losses.  Without doing so, any conclusion that such yield losses did not vary by product
could not have been supported by substantial evidence.

Defendant further seeks to justify Commerce's determination that Jindal SAW's
reported yield losses reasonably reflected its COP by arguing that "[e]ven if different
production stages could generate different yields, Commerce noted that [[        ]] of
the OCTG that Jindal SAW produced went through precisely the same production
stages—namely, threading and coupling."  Def.'s Resp. Br. 61.  Even if [[   ]]% of Jindal
SAW's product went through the same production stages, that would not confirm that
products with [[       ]] physical characteristics [[      ]] lose [[       ]] amounts of
material during those production stages.  It stands to reason that pipes of [[

                              ]] would lose [[        ]] amount of material.  Commerce may
have had a basis to conclude that yield losses that occurred at later production stages
were insignificant, but it cites to no record evidence to support this assertion.  Commerce
does not indicate it undertook any investigation to test whether certain production stages

resulted in insignificant generation of scrap.  Therefore, Commerce's implicit conclusion that yield losses [[                    ]] by physical characteristic or production stage could not have been supported by substantial evidence.

On remand, Commerce must explain why Jindal SAW's reported yield loss data, which clearly did not track yield losses by production stage or physical characteristics of the merchandise, nonetheless did not distort Jindal SAW's COP for specific CONNUMs of subject merchandise or reconsider its determination.  The court defers any review of Commerce's decision to decline to apply AFA to Jindal SAW's yield loss data until Commerce supports its determination regarding whether its yield loss data reasonably reflects its COP with substantial evidence.

## III.    Claims Relating to Mandatory Respondent GVN

### A.     Collapsing of GVN with MSL and JPL

U.S. Steel argues that "Commerce improperly collapsed GVN with its affiliated suppliers, MSL and JPL."  U.S. Steel Br. 45.  Defendant responds that U.S. Steel's arguments are belied by the record evidence in support of Commerce's collapsing determination.  See Def. Resp. Brief 18.  The court finds Commerce's determination is supported by substantial evidence.

Commerce's regulations permit it to

treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure

> manufacturing priorities . . . and [Commerce] concludes that there is a
> significant potential for the manipulation of price or production.[22]

19 C.F.R. § 351.401(f)(1).  Commerce's regulations provide that the factors Commerce

may consider in assessing whether there is a "significant potential for manipulation of

price or production" for collapsing affiliated producers include:

(i)  The level of common ownership;
(ii)  The extent to which managerial employees or board members of one
firm sit on the board of directors of an affiliated firm; and
(iii) Whether operations are intertwined, such as through the sharing of sales
information, involvement in production and pricing decisions, the sharing
of facilities or employees, or significant transactions between the
affiliated producers.

19 C.F.R. § 351.401(f)(2).

Although Commerce's collapsing regulation speaks of treating two or more

affiliated producers as a single entity, Commerce has developed a practice of collapsing

exporters with affiliated producers of subject merchandise under certain circumstances.

See Certain Frozen and Canned Warmwater Shrimp From Brazil, 69 Fed. Reg. 76,910,

76,912 (Dep't Commerce Dec. 23, 2004) (notice of final determination of sales at less

than fair value); see also Issues and Decision Memorandum for the Antidumping Duty

Investigation of Certain Frozen and Canned Warmwater Shrimp From Brazil, A-351-838,

---

[22] If affiliated producers are collapsed, those companies may be considered a single entity.
Collapsing entities allows sales of one collapsed entity to be considered sales of the other for
purposes of Commerce's dumping margin calculation.  See 19 C.F.R. § 351.401(f)(1); 19 U.S.C.
§ 1675(a)(2)(A)(ii); 19 U.S.C. § 1677b(a).  Commerce found "GVN is the sole exporter of OCTG
produced by MSL and JPL, and GVN only exports OCTG produced by MSL and JPL," which
Commerce found demonstrates "a close supplier relationship and a significant volume of
interparty transactions."  Prelim. Decision Memo at 8.  In other words, because GVN lacked sales
in the Indian market, collapsing it with its affiliated producers, MSL and JPL, permitted Commerce
to use sales of MSL and JPL for the normal value portion of its dumping calculation.

(Dec. 23, 2004), underline available at http://ia.ita.doc.gov/frn/summary/brazil/04-28110-1.pdf (last

visited Apr. 17, 2016) ("Shrimp From Brazil I&D Memo").   In outlining its practice of

collapsing exporters with affiliated producers,[23] Commerce noted that

> [w]hile 19 C.F.R. 351.401(f) applies only to producers, the Department has
> found it to be instructive in determining whether non-producers should be
> collapsed and used the criteria outlined in the regulation in its analysis.
>
> . . .
>
> Accordingly, we have looked to the criteria articulated in section
> 351.401(f)(2) in determining whether to treat these affiliates as a single
> entity.

Shrimp From Brazil I&D Memo at 14.   Therefore, Commerce's practice for collapsing

exporters with affiliated producers is to look solely at the second requirement under its

regulation that the relationship between the affiliated companies raises "a significant

potential for manipulation of price or production."   See Shrimp From Brazil I&D Memo at

14; see also 19 C.F.R. § 351.401(f)(1).

    In assessing whether such significant potential for manipulation of price or

production exists, Commerce has incorporated the criteria from 19 C.F.R § 351.401(f)(2),

as well as other criteria Commerce finds indicate "a significant potential for manipulation."

See Shrimp From Brazil I&D Memo at 14.   For Commerce's collapsing determination to

be supported by substantial evidence, the evidence must be sufficient that a reasonable

mind might accept the evidence as adequate to support its conclusion while considering

---

[23] Since only affiliated entities are collapsed under either the regulation or Commerce's practice, Commerce must also find that any entities it collapses are affiliated.  See Shrimp From Brazil I&D Memo at 14; see also 19 C.F.R. § 351.401(f)(1).  Commerce found that GVN, MSL, and JPL are "affiliated through the common control of the Jindal family."  Final Decision Memo at 22; see also 19 U.S.C. § 1677(33).  Since U.S. Steel does not challenge Commerce's finding of affiliation, the court does not address the reasonableness of this finding.  See U.S. Steel Br. 45.

contradictory evidence.   See Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197,229 (1938); see also Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994).   Since the structure of the regulation, which is incorporated in Commerce's practice, makes clear that Commerce need not consider all of the §351.401(f)(2) factors, Commerce need not conclude on the basis of any one factor listed in the regulation alone that the potential for manipulation of price or production was significant.   See Shrimp From Brazil I&D Memo at 14 (adopting a practice based upon 19 C.F.R. § 351.401(f)(2)).

    Commerce's collapsing determination is supported by substantial evidence.   First, although Commerce recognized that the D.P. Jindal family's ownership in GVN is "less than majority ownership, it is considerable, particularly given GVN's otherwise diffused ownership by corporate entities with numerous layers of cross-ownership."   Final Decision Memo at 24.   The level of common ownership supported Commerce's finding that there was a significant potential for manipulation because the family held significant majority holdings in both MSL and JPL, [[      ]] GVN's [[    ]] suppliers of subject merchandise.   Id.  Commerce cited the companies' sharing of sales information and price coordination to support its conclusion that the companies' intertwined operations indicated a significant potential for manipulation.   Id. at 25.   Commerce found that MSL was involved in GVN's pricing decisions.   Commerce based this finding on evidence it obtained at verification that

> the company has internal price guidelines that are based on market price
> and demand, and are set by the heads of GVN, MSL and JPL on an *ad hoc*
> basis.  MSL is the driver of the price determination discussion because it is
> the company that is actually producing the merchandise.  MSL has limited
> capacity, and must decide how much to sell to each market on a monthly
> basis. . . .  If GVN needs to go below the lowest price set in the price list,
> they must seek approval from MSL.

Verification of the Sales Response of GVN Fuels Ltd in the Antidumping Duty
Investigation of Oil Country Tubular Goods from India at 9, CD 340, bar code 3200010-01
(May 5, 2014) ("GVN Sales Verification Report").

U.S. Steel seeks to undermine Commerce's finding that the companies are
involved in each other's pricing decisions by pointing out that GVN plays no role in the
domestic sales of MSL or JPL.  See U.S. Steel Br. 50; see also Shrimp From Brazil I&D
Memo at 14; 19 C.F.R. § 351.401(f)(2)(iii).  Yet, nothing in Commerce's practice requires
Commerce to find that the involvement in production or pricing decisions must flow in both
directions in order to collapse affiliated companies.  See Shrimp From Brazil I&D Memo
at 14; 19 C.F.R. § 351.401(f)(2)(iii).  Moreover, given GVN's reported role as the export
arm of MSL and JPL, see GVN Sales Verification Report at 3, it is unsurprising that GVN
is not involved in the domestic sales of MSL and JPL.  Although the sharing of sales
information and GVN's markup could have been a reflection of a market-based
commission for a sales agent, trading company, or distributor, Commerce's conclusion to
the contrary was not unreasonable in light of its separate finding that the companies
coordinated pricing and that MSL drove the pricing discussion.  See GVN Sales
Verification Report at 9.

Second, Commerce relied in part upon the fact that the companies shared the same chart of accounts to conclude the companies shared sales information.  See Final Decision Memo at 25.  Although Commerce acknowledged that GVN used a different accounting system from MSL and JPL, Commerce concluded that the companies still shared sales information because GVN said it shared such information with MSL at verification, and Commerce determined that GVN and JPL used identical product codes. See GVN Sales Verification Report at 11.  Commerce's finding that MSL drove GVN's sales price determinations, particularly in light of the fact that it found MSL decides what types of products it will produce, GVN Sales Verification Report at 9, reasonably indicated that MSL was involved in GVN's pricing decisions and potentially influenced by GVN's customer expectations in the export market.  Further, Commerce relied upon the fact that the companies had significant transactions among them and that GVN did not produce merchandise but exported for both MSL and JPL.  See Final Decision Memo at 24–25.

Third, Commerce also found that MSL and JPL shared a chairman of the board in Mr. D.P. Jindal.  Id. at 24.  Further, Commerce concluded that MSL and GVN shared at least one employee based upon an adjustment in GVN's accounting records for an employee working for GVN, but paid by MSL.  Id.  In addition, Commerce found the companies shared facilities and employees because the companies share marketing offices throughout India, including a shared corporate office in Gurgaon, India, where verification took place.  Id.  Moreover, record evidence indicates that Mr. D.P. Jindal handles "strategic direction of corporate policies, . . . all activities relating to Finance (long term & short term), corporate [a]ccounts, [m]arketing ([d]omestic & [e]xport) and

[s]trategic sourcing (indigenous & import)" from the companies' shared marketing office. Response Pertaining to GVN Supplemental Sections A–C Response at Ex. S1-32, PD 229–236, bar codes 3175712-01–08 (Jan. 23, 2014) ("GVN Supp. Sections A–C Resp.").[24]  It was reasonable for Commerce to conclude that the shared corporate office in Gurgaon, which housed the office of the chairman of both MSL of JPL who handled a broad portfolio of issues that affected all of the companies, created at least the potential for manipulation of price or production.[25]

---

[24] In its Final Decision Memo, Commerce sometimes conflates the three indicia of price manipulation set forth under 19 C.F.R. § 351.401(f)(2): level of common ownership, sharing of managerial and board members and intertwining of operations.  Commerce notes the sharing of managerial employees between GVN and MSL and that employees of the three companies work together at shared corporate offices in Gurgaon.  See Final Decision Memo at 24.  Although, Commerce cites this evidence when discussing shared board members, it is actually relevant to the companies' intertwined operations.  See id.  Likewise, although Commerce found that Mr. D.P. Jindal was the chairman of the board of both MSL and JPL, a role which Commerce found gave him the capacity to "direct or restrain decisions relating to the production, pricing, or cost of the subject merchandise" of GVN as a result of the D.P. Jindal Family Group's control over GVN, Commerce did not find that any member of GVN's board sat on the board of MSL or JPL.  See id.  D.P. Jindal's role on the boards of MSL and JPL, by itself, is not relevant to collapsing GVN with MSL and JPL, but it does support a finding that the operations of the companies are intertwined.  See id.  Although Commerce's explication of the basis for its decision could have been clearer, its path is reasonably discernable.

[25]  U.S. Steel also disputes Commerce's finding that the three companies share facilities or employees in the form of marketing offices "throughout India."  See id. at 49.  Nothing in Commerce's practice or its regulation indicates that the sharing of facilities must be widespread or that one shared facility is insufficient to support a finding that operations are intertwined.  Moreover, in light of the record evidence indicating the key role of the Gurgaon office, see GVN Supp. Sections A–C Resp. at Ex. S1-32, that GVN, MSL, and JPL, the fact that the companies did not literally share many marketing offices all over India does not undermine the reasonableness of Commerce's conclusion that the shared corporate office in Gurgaon created a potential for manipulation of price or production.

U.S. Steel also argues that the fact that MSL pays the salary of an employee working for GVN "does not show that the single GVN employee on MSL's payroll is a director or managerial employee that has the ability to manipulate prices or production as claimed by Commerce."  U.S. Steel Br. at 48–49.  Even if Commerce's findings that the companies' shared employees were

(footnote continued)

Together, Commerce made findings supported by substantial evidence that GVN, MSL, and JPL were affiliated because of common control by the D.P. Jindal Group, and that the companies possessed: (1) a shared level of common ownership by the D.P. Jindal family in all three entities; (2) intertwined operations; and (3) shared employees and facilities.  The court concludes that Commerce reasonably determined, in spite of the detracting evidence, that the collective weight of the potential for manipulation was significant.

U.S. Steel's arguments disputing the reasonableness of Commerce's decision and its consistency with past practice are unavailing.  U.S. Steel argues that Commerce lacked substantial evidence to conclude that the level of common ownership of the three companies by the D.P. Jindal family demonstrated a significant potential for manipulation. See U.S. Steel Br. 47; see also Shrimp From Brazil I&D 14; 19 C.F.R. § 351.401(f)(2)(i). U.S. Steel argues the D.P. Jindal family members' minority stake in GVN is held in a "diffuse manner," and at best there is an abstract possibility to exert control.  U.S. Steel Br. at 47–48.

U.S. Steel's arguments improperly discount the significance of GVN's indirect shareholdings in JPL. See id. at 48.  Yet, nothing in Commerce's practice of collapsing, which incorporates 19 C.F.R. § 351.401(f)(2), indicates that indirect ownership among affiliated entities may not support collapsing affiliated producers with exporters.  See

---

limited, Commerce's findings of shared facilities, when viewed together with MSL's and JPL's involvement in pricing decisions of GVN, were significant enough to support a reasonable inference that these arrangements at least gave rise to the potential for manipulation of price or production.  Therefore, Commerce reasonably concluded that GVN, MSL, and JPL's shared facilities and employees created a potential for manipulation of price or production.

Shrimp From Brazil I&D Memo at 14; 19 C.F.R § 351.401(f)(2).  Moreover, Commerce

recognized that the D.P. Jindal family's holdings amounted to less than a majority stake,

but nonetheless concluded that the D.P. Jindal family's control was more active than that

of other shareholders.[26]  See Final Decision Memo at 24; see also GVN Sales Verification

Report at 8–10.  In light of Commerce's finding that GVN, MSL and JPL were under the

common control of the D.P. Jindal family, which U.S. Steel does not dispute, together with

its other findings, it was reasonable for Commerce to conclude that the level of common

ownership was also sufficient to create a significant potential for manipulation of price or

production.

        Next, U.S. Steel argues that the record does not support Commerce's conclusion

because the companies did not share managerial employees or board members.  See

U.S. Steel Br. 48–50; see also Shrimp From Brazil I&D Memo at 14; 19 C.F.R.

§ 351.401(f)(2)(ii).  Sharing managerial employees or board members may support

Commerce's collapsing determination if Commerce concludes that either creates a

significant potential for the manipulation of price or production.  See Shrimp From Brazil

I&D Memo at 14; 19 C.F.R. § 351.401(f)(2).  However, Commerce need not find all of the

factors in the regulation present to find a significant potential for manipulation of price or

production.  Commerce's findings on other factors were sufficient to reasonably find a

---

[26] Commerce noted in particular the family's significant majority ownership of MSL and JPL and those companies' involvement in the pricing and sales decisions of GVN.  See Final Decision Memo at 24; see also GVN Sales Verification Report at 8–10.

significant potential for manipulation of price or production. Its collapsing determination was therefore also supported by substantial evidence.

Next, U.S. Steel argues that Commerce lacked substantial evidence to conclude that GVN, MSL, and JPL have sufficiently intertwined operations to create a significant potential for manipulation of price or production. See U.S. Steel Br. 50; see also Shrimp From Brazil I&D Memo at 14; 19 C.F.R. § 351.401(f)(2)(iii). Specifically, U.S. Steel argues that the sharing of sales information was nothing more than ordinary discussions regarding product specifications and commission rates. U.S. Steel Reply Br. 14. Yet, U.S. Steel's assertion that the sales information may have been shared for a purpose other than manipulation of price or production is not supported by any record evidence. Moreover, it cites no record evidence that renders Commerce's conclusion that information was shared between the three companies unreasonable. While U.S. Steel points to practical difficulties to the three companies sharing of sales information[27] and evidence undermining Commerce's conclusion that the parties share the same chart of accounts,[28] Commerce's conclusions on this issue did not rely exclusively upon its

---

[27] For instance, U.S. Steel argues GVN could not have shared sales information with MSL and JPL because the companies used different accounting systems. U.S. Steel Br. 51–52.

[28] U.S. Steel points to discrepancies between the charts of accounts of GVN as compared to those of MSL and JPL. U.S. Steel Br. 52. U.S. Steel relies upon a comparison of line item descriptions in the respective charts of accounts of GVN, MSL and JPL to support its claims that the companies do not share a chart of accounts. U.S. Steel Br. 51–52; U.S. Steel Reply 14 (citing Response Pertaining to GVN at Exs. G-8, M-8, J-5, PD 107–133, bar codes 316044-01–27 (Oct. 25, 2013) ("GVN Section A Response"). Commerce did conclude that the companies share the same charts of accounts, see Final Decision Memo at 25, but Commerce could not have meant that the names of accounts were entirely coextensive since Commerce found that GVN operates

(footnote continued)

findings about shared accounting systems or charts of accounts.  As discussed above, Commerce found that the operations of GVN, MSL, and JPL were intertwined because MSL drove GVN's price determinations for GVN's sales.  Consequently, none of the evidence relied upon by U.S. Steel renders Commerce's conclusion that the companies shared sales information unreasonable based upon the record before it.

U.S. Steel also disputes Commerce's conclusion that the companies jointly make export pricing decisions. See U.S. Steel Br. at 51.  U.S. Steel claims that the sharing of sales information involves merely commonplace discussions of product specifications and commissions.  See U.S. Steel Br. 51; U.S. Steel Reply Br. 14; see also Shrimp From Brazil I&D Memo at 14; 19 C.F.R. § 351.401(f)(2)(iii).  Yet, U.S. Steel cites no record evidence to support these assertions.   In fact, GVN's supplemental questionnaire response cited by U.S. Steel, see U.S. Steel Br. 51, supports Commerce's finding that MSL and JPL were involved in pricing decisions of GVN because GVN indicated in its questionnaire response that

> GVN has a price list (received from MSL) for exports based on which GVN negotiates with its U.S. customers.  However, MSL or JPL does not have a price list of sales made to GVN, as the price that is to be charged to GVN is based on the price at which GVN sales to it[s] U.S. customer.  Thus the price which GVN charges to its customer is known to MSL.

---

as the export arm MSL and JPL, see id. at 24; GVN Sales Verification Report at 8, and that GVN had no involvement in home market sales whereas MSL and JPL did. See GVN Sales Verification Report at 6–8.  The descriptions contained in GVN's charts of accounts contain descriptions pertaining to JPL and MSL without any entries reflecting transactions.  See GVN Section A Response at Ex. G-8.  Likewise, the descriptions contained in each of MSL's and JPL's charts of accounts contain descriptions pertaining to GVN. See id. at Exs. M-8, J-8.  Therefore, the record evidence relied upon by U.S. Steel is not sufficiently detailed to render Commerce's conclusion that the parties share some charts of accounts unreasonable based upon the record evidence.

Response Pertaining to GVN Second Supplemental Sections A–C Response at 7, PD 288–297, bar codes 3186433-01–08 (Mar. 6, 2014).

U.S. Steel points to the lack of a written agreement "governing the sales relationship between the parties," to undermine Commerce's finding that the significant transactions between the companies created a significant potential for manipulation of price or production.  U.S. Steel Br. 50.  However, the lack of a written agreement does not render Commerce's conclusion unreasonable, particularly given that Commerce found that "GVN . . . only exported subject merchandise produced by MSL and JPL" and that GVN actually operates as the export arm for both MSL and JPL.  See Final Decision Memo at 24–25; see also GVN Sales Verification Report at 2–3.

U.S. Steel argues that the court previously "has rejected Commerce's collapsing determinations where the agency presented 'no evidence that there was actual manipulation of prices.'"  U.S. Steel Br. 46 (citing Hontex Enter., Inc. v. United States, 27 CIT 272, 299, 248 F. Supp. 2d 1323, 1346 (2003)).  U.S. Steel argues Commerce cited no evidence of actual manipulation between the three companies.  See id. at 51, 52; U.S. Steel Reply Br. 14.  However, contrary to U.S. Steel's claims, the court in Hontex did not require Commerce to find evidence of actual manipulation of price or export decisions in order for a collapsing decision to be supported by substantial evidence.  See Hontex, 27 CIT at 299, 248 F. Supp. 2d at 1346.  Rather, the court emphasized that Commerce must find "evidence that there is more than the 'mere possibility' that significant potential for manipulation could occur."  Id. at 298, 248 F. Supp. 2d at 1345 n.19 (citing U.S. Steel Grp. v. United States, 25 CIT 1293, 1298, 177 F. Supp. 2d 1325, 1331 (addressing the

statutory basis for disregarding sales due to a reasonable suspicion of price manipulation pursuant to 19 U.S.C. § 1677b(a), not the standard for collapsing)).

Further, in <u>Hontex</u>, Commerce's collapsing determination relied exclusively on the fact that the companies shared one employee whose relationship to the companies did not sufficiently demonstrate that the operations of the companies were intertwined.  <u>See</u> <u>id.</u> at 299, 248 F. Supp. 2d at 1346.  Here, Commerce's collapsing determination was based upon a level of common ownership and intertwined operations that were supported by substantial evidence of sharing of sales information, MSL's involvement in pricing decisions of GVN, and the companies' shared corporate headquarters.  Here, Commerce found more than a mere possibility of manipulation; it reasonably found a significant potential for manipulation of price or production.

U.S. Steel argues that Commerce's past practice is not to collapse "affiliated parties even where there was a robust level of common ownership, shared managerial employees and directors, and evidence of intertwined operations."  <u>See</u> U.S. Steel Br. 53–55.  Yet, with the exception of the Shrimp From Brazil I&D, all of the proceedings cited by U.S. Steel involve collapsing affiliated producers under Commerce's regulation, not Commerce's practice of collapsing exporters with affiliated producers.  <u>See</u> U.S. Steel Br. 53–55 (citing <u>Stainless Steel Bar From Germany</u>, 67 Fed. Reg. 3,159 (Dep't Commerce Jan. 23, 2002) (notice of final determination of sales at less than fair value) and accompanying Issues and Decision Memorandum for the Antidumping Duty Investigation of Stainless Steel Bar from Germany; Final Determination at Comment 15, A–428–830, (Jan. 15, 2002), <u>available at</u> http://ia.ita.doc.gov/frn/summary/germany/02-1657-1.txt (last

visited Apr. 17, 2016); see also Shrimp From Brazil I&D at 15; Stainless Steel Sheet and Strip Coils From Taiwan, 67 Fed. Reg. 6,682 (Dep't Commerce Feb. 13, 2002) (final results and partial rescission of antidumping duty administrative review) and accompanying Issues and Decision Memorandum for the Final Results of Antidumping Administrative Review of Stainless Steel Sheet and Strip in Coils From Taiwan at Comment 16, A–583–831, (Feb. 12, 2002), available at http://ia.ita.doc.gov/frn/summary/taiwan/02-3540-1.txt (last visited Apr. 17, 2016); Chia Far Indus. Factory Co. v. United States, 28 C.I.T. 1337, 1366–67, 343 F. Supp. 2d 1344, 1371–73 (affirming Commerce's determination in Stainless Steel Sheet and Strip in Coils From Taiwan not to collapse three affiliated companies). Consequently, their applicability is limited to the context of collapsing affiliated producers.

U.S. Steel argues that although Commerce's practice permits it to collapse producers with non-producers, "it still considers the possibility of shifting production to non-producers as part of its collapsing analysis." U.S. Steel Br. 54 (citing Shrimp From Brazil I&D Memo at 15). While the exporter collapsed in the Shrimp From Brazil I&D Memo did have production facilities, see Shrimp From Brazil I&D Memo at 15, as already discussed, Commerce did not adopt the substantial retooling prong of 19 C.F.R. § 351.401(f)(1). See id. at 14. Rather, it found the criteria in 19 C.F.R. § 351.401(f)(2) (i.e., significant potential for manipulation of price or production) instructive in determining whether to collapse exporters with affiliated producers. See id. In that proceeding, the companies collapsed were on the same premises. See id. Commerce also found that the companies were principally owned by the father of the persons who controlled and

managed both entities, that the companies shared board members, and that "the management of [the producer] is largely controlled by the two individuals who own and manage the [exporter]." See id. Commerce only analyzed the fact that both companies had production facilities because the facilities of the producer were on the same premises as the exporter. See id. However, Commerce's articulation of its practice indicates that such a finding was not necessary to its collapsing analysis. See id.

Lastly, U.S. Steel argues that Commerce's application of its practice with respect to GVN conflicts with its application of the same practice with regard to Jindal SAW. See U.S. Steel Br. 55. It argues that Commerce's disparate treatment of Jindal SAW in its affiliation determination and GVN in its collapsing determination are irreconcilable. See id. However, the affiliation criteria are wholly distinct from the collapsing criteria. See 19 U.S.C. § 1677(33); 19 C.F.R. § 351.401(f). Although affiliation is a condition precedent to collapsing, there is no dispute as to GVN's affiliation with MSL and JPL. Moreover, Commerce's collapsing analysis focused on a significant potential for manipulation of price or production, while its affiliation analysis focused on indicia of common control. Therefore, the parallel drawn between the two determinations by U.S. Steel is inapposite.

### B.    Commerce's Determination that GVN's Home Market Sales Were at One Level of Trade

U.S. Steel argues that Commerce erred by failing to properly compare GVN's U.S. sales and MSL's home market sales at the comparable levels of trade ("LOT"). U.S. Steel Br. 57–58. U.S. Steel argues that Commerce's conclusion that MSL's home market sales consist of one LOT ignores evidence that the selling activities between CHANNELH1 and

CHANNELH2 substantially differed.[29] Id. at 57–61.  Defendant argues that Commerce reasonably determined that there was only one LOT, and, therefore, its decision is in accordance with law and supported by substantial evidence.  See Def.'s Resp. Br. 39.

To determine whether merchandise is being sold in the United States at less than fair value and, if so, to calculate the ADD rate for the individually examined exporters and producers, Commerce must compare normal value to the export price of each entry of subject merchandise.  19 U.S.C. § 1677b(a)(1)(B)(i).  The statute requires that Commerce compare

> the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price.

Id.  However, the statute does not indicate how Commerce is to find matching levels of trade.  See generally 19 U.S.C. § 1677b(a).

Commerce's regulations provide that, the basis for identifying LOT and differences in those levels is "(i) [i]n the case of export price, the starting price; . . . (iii) [i]n the case of normal value, the starting price or constructed value."[30]  19 C.F.R. § 351.412(c)(1)(i),

---

[29] MSL, the producer of most of GVN's subject merchandise, reported three channels of customers: exploration and production ("E&P") public sector, E&P private sector, and original equipment manufacturer ("OEM") sector.  See GVN Sales Verification Report at 6.  The channel of distribution referred to as "CHANNELH1" includes home market sales to both public and private sector E&P purchasers.  The home market channel of distribution referred to as "CHANNELH2" includes sales to OEM purchasers.

[30] The "starting price" is the price to the unaffiliated purchaser that is a component of export price and normal value before any adjustments to either that may be applicable under 19 U.S.C. § 1677a(c)–(d) or 19 U.S.C. § 1677b(a)(6)–(7), respectively.  See Final Rule on Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,411 (Dep't Commerce May 19, 1997) (final rule revising Commerce's regulations on antidumping and countervailing duty proceedings to conform to the Uruguay Round Agreements Act).

(iii).  Further, Commerce "will determine that sales are made at different levels of trade if

they are made at different marketing stages (or their equivalent)."  Id. § 351.412(c)(2).  In

promulgating its regulation, Commerce clarified that in order to consider sales to occur at

different LOT,

> [e]ach more remote level must be characterized by an additional layer of
> selling activities, amounting in the aggregate to a substantially different
> selling function.  Substantial differences in the amount of selling expenses
> associated with two groups of sales also may indicate that the two groups
> are at different levels of trade.

Final Rule on Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,371

(Dep't Commerce May 19, 1997) ("Final Rule ADD; CVD").  Commerce also clarified that

> [a]lthough the type of customer will be an important indicator in identifying
> differences in levels of trade, the existence of different classes of customers
> is not sufficient to establish a difference in the levels of trade.  Similarly,
> while titles, such as "original equipment manufacturer," "distributor,"
> "wholesaler," and "retailer" may actually describe levels of trade, the fact
> that two sales were made by entities with titles indicating different stages of
> the marketing process is not sufficient to establish that the two sales were
> made at different levels of trade.

Id.

The regulations also provide that "[s]ubstantial differences in selling activities are

a necessary, but not sufficient, condition for determining that there is a difference in the

stage of marketing.  Some overlap in selling activities will not preclude a determination

that two sales are at different stages of marketing."  19 C.F.R. § 351.412(c)(2).  The SAA

explains that a difference in the level of trade is where "there is a difference between the

actual functions performed by the sellers at the different levels of trade in the two

markets."   SAA, H.R. Rep. No. 103-316, vol. 1 at 829, 1994 U.S.C.C.A.N. at 4,168.

However, Commerce explained in the course of promulgating its regulations that "the statute uses the term 'level of trade' as a concept distinct from selling activities." See id. Commerce emphasized that

> in situations where some differences in selling activities are associated with different sales, whether that difference amounts to a difference in the levels of trade will have to be evaluated in the context of the seller's whole scheme of marketing.

Final Rule ADD; CVD, 62 Fed. Reg. at 27,371.  Therefore, the statute and the regulations permit Commerce to find more than one level of trade when it finds sales are made at different marketing stages, which may be evidenced by different selling activities as well as other facts.  See generally 19 U.S.C. § 1677b(a); 19 C.F.R. § 351.412(c)(2).

Commerce reasonably found that MSL's home market channels of distribution did not evidence an additional layer of selling activity or function because Commerce reasonably determined: (1) the selling expenses in each channel of distribution were substantially similar; and (2) in the context of MSL's marketing scheme there was no significant difference in the breadth and intensity of selling functions performed in each channel of distribution.  In its final determination, Commerce acknowledged that GVN's officials stated there were two channels of distribution in its home market.  See Final Decision Memo at 26.  However, evaluating the selling functions at issue in this investigation, after weighing the differences in each channel of distribution, Commerce found that they did "not warrant two LOTs." Id. at 28.  The court finds Commerce's conclusion reasonable.

Commerce compared the selling activities and sales functions MSL performed in the CHANNELH1 and CHANNELH2 sales and concluded that they were not significantly different.  See id. at 26.  Specifically, Commerce "noted minor differences between sales to public sector and private sector [exploration and production ("E&P")] customers, but [Commerce concluded] GVN had no major changes to its degree of selling activities in any of its channels of distribution."[31]  Id.; see also GVN Sales Verification Report 9–10.  Commerce based this determination on its evaluation of each selling activity/function and noting "each line item's intensity level," qualitatively categorizing each selling activity/function as being performed "always," "frequently," "sometimes," or "never."  See GVN Sales Verification Report at 9; see also Sales Verification Exhibits of GVN Fuels Limited ("GVN") at Exhibit 5, CD 297–312, bar codes 3191526-01–10 (Mar. 28, 2014).  Based upon this broad evaluation, Commerce found no discrepancies in either the range or intensity of selling functions between CHANNELH1 and CHANNELH2 customers.[32]  See GVN Sales Verification Report at Exhibit 5.

Commerce also compared the selling expenses associated with the two groups of sales and concluded that "there are no differences in inventory maintenance, and warehousing practices, and only minimal difference in freight, and insurance practices,

---

[31] Public and private sector E&P customers together make up the CHANNELH1 channel of distribution.  See GVN Sales Verification Report at 9.

[32] Commerce acknowledged that there may have been a difference in the intensity in the procurement/sourcing service selling function between public and private sector E&P customers.  See GVN Sales Verification Report at 9.  However, this difference in intensity between public and private sector E&P customers, which both occurred within CHANNELH1, is not relevant to Commerce's LOT analysis because no party argues that public sector and private sector E&P end user customers represented different LOTs.

resulting in minimal differences in the selling expenses between the two home market channels." See Final Decision Memo at 26.  Although Commerce acknowledged a difference in the length of the sales process between CHANNELH1 and CHANNELH2 sales, Commerce concluded that the different length was a result of "awaiting a decision from the public sector customer." Id. at 27.  Commerce also concluded that there was no significant discrepancy between the selling expenses MSL incurred to provide third party inspections in each of its channels of distribution. Id.  Further, Commerce concluded that the differences in inland freight services between sales in CHANNELH1 versus CHANNELH2 were not significant because it concluded that "for over 99 percent of the sales made in CHANNELH1, the customer either paid the freight directly, or MSL paid the freight and charged the customer for the freight as a separate line item on the invoice.  In fact, in CHANNELH1, there was only one sale for which MSL provided freight services." Id. at 28 (internal quotations omitted).  Commerce therefore reasonably concluded that a majority of sales through CHANNELH1 and all sales in CHANNELH2 included the same expenses for inland freight and inland insurance.  See id.

Lastly, Commerce acknowledged that CHANNELH1 customers were different types than those in CHANNELH2, but it implicitly concluded on the basis of its comparison of selling functions, activities, and expenses, that the similarities between MSL's channels of distribution outweighed any label placed upon the customer types in each channel of

distribution. [33]  See id.  Although the court would prefer that Commerce had explicitly engaged in such a weighing, Commerce's path was reasonably discernible.

U.S. Steel unpersuasively argues Commerce disregarded additional selling activities and functions performed in CHANNELH1 without sufficient explanation.  See U.S. Steel Br. 58–60.  U.S. Steel specifically argues that Commerce disregarded differences in the length and complexity of the sales process.  See id. 58, 60–61.  Yet, as discussed above, Commerce explicitly considered and explained the lengthy decision process in some CHANNELH1 sales.  See Final Decision Memo at 27.  U.S. Steel cites no record evidence that undermines the reasonableness of Commerce's explanation.

Likewise, although U.S. Steel attaches great significance to activities that MSL's sales team must perform to monitor offer announcements and submit bids, U.S. Steel cites no record evidence that such activities translate to increased selling expenses, which might indicate an additional layer of selling activities.  See U.S. Steel Br. 58–59.  U.S. Steel stresses that MSL pays facilitators a monthly retainer unique to CHANNELH1 sales.  U.S. Steel Reply Br. 29 (citing GVN Supp. Sections A–C Resp. at 11–12).  Commerce explicitly recognized the use of facilitators, which Commerce noted are used in both the home market and the U.S. market, but Commerce reasonably concluded that

---

[33] Commerce and MSL officials acknowledged that sales denominated CHANNELH2 sales were made to a sector labeled "original equipment manufacturer (OEM) sector."  See GVN Sales Verification Report at 6.  Commerce compared these OEM sector sales to those to E&P private sector companies, and noted these sales were similar except that these sales did not require performance bank guarantees.  See id. at 8.  However, Commerce separately concluded that such bank guarantees were only requested by some customers.  Id. at 7

their use does not indicate complexity of the sales process in either market.  <u>See</u> Final Decision Memo at 27.

U.S. Steel also argues that Defendant ignores differences in marketing stages that are key to identifying levels of trade, and instead "focuses almost exclusively on differences in selling expenses between levels of trade."  <u>See</u> U.S. Steel Reply Br. 25– 26.  However, as the preamble to Commerce's regulations recognizes, substantial differences in the amount of selling expenses associated with two groups of sales may indicate differences in selling activities.  <u>See</u> <u>Final Rule ADD; CVD</u>, 62 Fed. Reg. at 27,371.  Such differences in selling activities may, in turn, amount to differences in selling functions evaluated within the context of the seller's marketing scheme.  Here, Commerce reasonably relied upon its finding that the selling activities and functions in each of GVN's channels of distribution were not significantly different.  Commerce also concluded on the basis of its comparison of selling functions, activities, as well as selling expenses, that the similarities between MSL's channels of distribution outweighed any label placed upon the customer types in each channel of distribution.

U.S. Steel also contrasts the provision of performance bank guarantees in some CHANNELH1 sales while it argues "[t]here are no guarantee or earnest money requirements for CHANNELH2 sales."  U.S. Steel Br. 60.  However, U.S. Steel does not highlight any record evidence indicating that the provision of bank guarantees results in higher selling expenses or higher prices to customers.  Moreover, U.S. Steel does not even argue that guarantees or earnest money requirements are not provided for CHANNELH2 sales, but rather, merely that they are not required.

Next, U.S. Steel argues that Commerce disregarded the fact that "MSL arranges

and pays for freight for a [[              ]] portion of CHANNELH1 sales," whereas "MSL

provided or arranged freight for [[                          ]] sales during the POI." See id.

at 62.  These assertions are directly at odds with Commerce's findings that:

> the home market sales listing reveals that for over 99 percent of the sales
> made in CHANNELH1, the customer either paid the freight directly, or MSL
> paid the freight and charged the customer for the freight as a separate line
> item on the invoice.  In fact, in CHANNELH1, there was only one sale for
> which MSL provided freight services.

Final Decision Memo at 28 (internal quotations omitted).   However, U.S. Steel's

characterization of the breadth of MSL's arrangement for freight services rests on its

assumption that MSL incurs significant freight expenses despite the fact that customers

ultimately reimburse it.  See U.S. Steel Reply Br. 31.  Indeed, U.S. Steel alleges only that

MSL arranged for freight services for a [[    ]] number of CHANNELH1 sales but

acknowledges that MSL does not absorb much of those costs itself.  See id.  As U.S.

Steel also acknowledges, to the extent that MSL does incur costs for arranging freight for

customers who later reimburse it for those costs, those costs are limited to credit

expenses necessary to cover such costs until MSL receives payment from customers.

See U.S. Steel Br. 62.   Commerce reasonably concluded that reimbursed freight

expenses were not significant selling expenses that indicated an additional layer of selling

activity.

U.S. Steel objects that Commerce used these freight expenses to reduce MSL's

normal value in conducting its dumping margin calculations while ignoring those

expenses in its level of trade analysis.  U.S. Steel Br. 60.  Commerce properly adjusted

GVN's normal value to reflect "an imputed credit expense for the freight revenue due," see GVN Fuels Limited Preliminary Determination Analysis Memoranda at 6, CD 225, bar code 3183289-01 (Feb. 14, 2014), to exclude selling expenses that were not present in GVN's U.S. sales transactions to ensure an accurate comparison.   Nothing about this adjustment is inconsistent with Commerce's conclusion that these expenses were not significant enough to create an additional layer of selling activity.  Nor does the fact that Commerce made this adjustment to GVN's normal value indicate that it considered arranging for such services a significantly different selling activity.[34]   Therefore, Commerce's determination that MSL's advancement of freight costs and arrangement of freight services did not indicate a second level of trade is not unreasonable.

Next, U.S. Steel argues that "MSL provides both third party inspections and inland freight insurance for a [[      ]] portion of its sales to [[      ]] customers," whereas for CHANNELH2 sales, "MSL does not [[                                           ]]" and [[      ]] provide inland freight insurance [[                    ]].  See U.S. Steel Br. 60–61.  In support of this argument, U.S. Steel submits a synthesis of sales data drawn from MSL's home market database indicating that MSL provided inland insurance to [[      ]]% and third party inspections to [[      ]]% of sales in CHANNELH1, respectively, while MSL provided these services to [[   ]] sales and [[      ]]% of sales, respectively, in CHANNELH2.

---

[34] At oral argument, U.S. Steel argued that Commerce would not have made any adjustment to GVN's normal value to reflect freight expenses if the activity of arranging freight on behalf of customers did not amount to a separate selling function.  See Conf. Oral Arg. 01:52:35–01:52:56. U.S. Steel offered no support for this assertion.

Citing GVN's rebuttal case brief, Commerce found that "record evidence indicates that third party inspections were not significantly different between the various channels." Final Decision Memo at 27 (citing Rebuttal Brief of GVN Fuels Limited ("GVN") and its Affiliates Maharashtra Seamless Limited ("MSL") and Jindal Pipes Limited ("JPL") at 21–22, CD 351, bar code 3206629-01 (June 2, 2014) ("GVN Administrative Rebuttal Brief")). Commerce's reliance on GVN's Administrative Rebuttal Brief provides no further clarity as to the source of the discrepancy between Commerce's characterization and the facts relied upon by U.S. Steel.  GVN argues that "[t]he home market sales database shows that third party inspections were done for [[         ]] percent of sales to CHANNELH2."  See GVN Administrative Rebuttal Brief at 21.  Defendant's response to U.S. Steel's argument is merely to recite Commerce's finding that the differences were minimal.  See Def.'s Resp. Br. 44.  The discrepancy in the parties' statistics is apparent.

However, arranging for inland insurance and third party inspections, like arranging for inland freight, involves contacting a third party, not the provision of those services by the company itself.  Therefore, although Commerce did not address these differences in arranging for these services, its explanation is reasonably discernible from the way it addressed inland freight expenses.  The magnitude of the differences in arranging for inland insurance and third party inspections is not the critical evaluation for Commerce in determining whether there is a separate level of trade.  Under Commerce's regulation, the key consideration is whether the service represented a substantially different selling function.  Like in arranging for inland insurance, it was not unreasonable for Commerce to conclude that arranging for inland insurance or inspections by a third party does not

represent a substantially different selling function.  See 19 C.F.R. § 351.412(c)(2).  The fact that these expenses may be incurred is not determinative under Commerce's regulation.

Next, U.S. Steel argues that, under Commerce's practice and regulations, CHANNELH2 sales to intermediary parties should be considered a different level of trade "than sales to end users made through CHANNELH1."  U.S. Steel Br. 61.  U.S. Steel relies upon Glycine From India, 72 Fed. Reg. 62,827, 62,832 (Dep't Commerce Nov. 7, 2007) (notice of preliminary determination of sales at LTFV), to support its position. Although Commerce noted that customers in one channel of distribution were end-users but traders in the other, Commerce did not rely exclusively upon that fact to preliminarily find two distinct levels of trade in both the home market and the U.S. market in that case. See id.  Rather, Commerce analyzed the sales functions and marketing process, and Commerce noted the degree of freight and delivery services provided was higher for traders than for end users.  See id.  Moreover, as already discussed, Commerce does not consider titles such as "end users" dispositive of a level of trade determination.  See Final Rule on ADD; CVD, 62 Fed. Reg. at 27,371.  Instead, Commerce's regulation focuses on selling functions and selling activities.  Id.  Here, Commerce properly considered the selling functions performed by GVN in each channel of distribution together with the different customer characteristics and it found the similarities in selling functions outweighed any difference in where the customers fell in the supply chain.

U.S. Steel claims Commerce should have calculated a dumping margin by comparing GVN's U.S. sales to home market sales in CHANNELH2 and its points to

perceived similarities between CHANNELH2 sales and GVN U.S. Sales.  See U.S. Steel

Br. at 65.  Since the court has already found that Commerce's evaluation of the selling

activities and functions performed in each channel of distribution was not significantly

different, any similarities between CHANNELH2 sales and GVN's U.S. sales would apply

equally to CHANNELH1 sales.  Therefore, as already discussed, Commerce acted in

accordance with 19 U.S.C. § 1677b(a)(1)(B)(i) and 19 C.F.R. § 351.412(c)(2) in utilizing

all of GVN's home market sales for its dumping margin calculations.

### C.    Granting GVN a Duty Drawback Adjustment Under the Advance License Program

U.S. Steel argues that Commerce erred in granting GVN a duty drawback

adjustment for benefits received under the ALP, an export incentive program established

by the Government of India ("GOI").  See U.S. Steel Brief 40–41.  Defendant responds

that "Commerce reasonably determined that GVN demonstrated a direct link between the

duty drawback received for this sale and the quantity of inputs imported."  Id. at 50.  The

court finds that Commerce's determination is supported by substantial evidence.

The statute provides that the export price shall be increased by "the amount of any

import duties imposed by the country of exportation which have been rebated, or which

have not been collected, by reason of the exportation of the subject merchandise to the

United States."  19 U.S.C. § 1677a(c)(1)(B).  The Court of Appeals for the Federal Circuit

has explained that

> when a duty drawback is granted only for exported inputs, the cost of the
> duty is reflected in NV but not in EP.  The statute corrects this imbalance,
> which could otherwise lead to an inaccurately high dumping margin, by
> increasing EP to the level it likely would be absent the duty drawback.

<u>Saha Thai Steel Pipe (Public) Co. v. United States</u>, 635 F.3d 1335, 1338 (Fed. Cir. 2011).

To determine whether a party claiming a duty drawback adjustment is entitled to such

adjustment, that party must establish that:

> (1) the import duty paid and the rebate payment are directly linked to, and
> dependent upon, one another (or the exemption from import duties is linked
> to exportation); and (2) there were sufficient imports of the imported raw
> material to account for the drawback received upon the exports of the
> manufactured product.

<u>Antidumping Methodologies: Market Economy Inputs, Expected Non–Market Economy</u>

<u>Wages, Duty Drawback; and Request for Comments</u>, 71 Fed. Reg. 61,716, 61,723 (Dep't

Commerce Oct. 19, 2006).

Here, substantial evidence supported Commerce's decision to grant a duty

drawback adjustment to GVN.  Commerce found in its preliminary determination and

reiterated in its final determination, that

> quantities of imported materials and exported finished products are linked
> through standard input-output norms established by the GOI.  The exporter
> is only allowed a drawback upon exportation for duties paid on the imported
> inputs.  GVN provided a reconciliation of the quantities of inputs imported
> and the drawback received.

Final Decision Memo at 15 (citing Prelim. Decision Memo at 14).  Commerce noted that

"GVN provided the license number, a copy of the license, and the U.S. sales that were

tied to this license, including copies of the associated commercial invoices and customs

documentation."  <u>Id.</u>  At verification, Commerce reviewed the license.  <u>See</u> GVN Sales

Verification Report at 21.  With regard to the imported material, Commerce noted that

"[t]he [harmonized tariff schedule ("HTS")] number for import covers hot rolled coil, which

company officials explained was used for subject and non-subject merchandise."  <u>Id.</u>

Commerce verified from review of supporting documents that GVN imported [[      ]] megatons ("MT") of hot rolled coil (i.e., an input for subject merchandise) under the license. See id.  Therefore, Commerce's finding that the import duty paid by GVN for its inputs are directly linked to, and dependent upon one another, was supported by substantial evidence.

        With regard to exported merchandise, Commerce noted a discrepancy between subject merchandise and the HTS number for the product permitted to be exported under GVN's license.  See id.  Commerce noted that GVN clarified the discrepancy by explaining that Indian government regulations required it to ship its subject merchandise under this HTS number or else apply for a special license.  See id.  Commerce implied that GVN claimed it could export its OCTG under the license placed on the record despite the fact the license appeared to cover non-subject merchandise.  See id.  Commerce verified the existence of the regulation cited by GVN, and Commerce further verified that, although the HTS number associated with exports under GVN's license "is not listed in the scope of the investigation," Commerce reviewed "all commercial exports under this license, and found that the item description for all exports was for OCTG."  Id.  Commerce further verified that all GVN's sales were reported in its latest U.S. market sales database.  Id. Therefore, Commerce's finding that GVN had attributed the imports it received when it exported manufactured products was supported by substantial evidence.  See id. at 15.

        U.S. Steel argues that Commerce's finding was not supported by substantial evidence because record evidence indicates GVN's license, which covers imports of [[                               ]] and not [[                          ]], does not cover inputs for subject

merchandise and covers exports of only non-subject merchandise.  <u>See</u> U.S. Steel Reply

Br. 17.  With regard to imports, U.S. Steel cites record evidence that GVN's advance

license covers imports of [[                              ]] because the Indian Trade Clarification

Harmonized System ("ITCHS") Code on the license was listed as [[             ]], which

corresponds to the ITCHS [[            ]] heading [[

                                                                      ]].  <u>See</u> <u>id.</u> (citing GVN Supp.

Sec. A–C Questionnaire Response at S1-25(d), CD 193–207, bar codes 3175629-01–15

(Jan. 23, 2014) ("GVN Supp. A–C Resp."); U.S. Steel Pre-Preliminary Comments re: GVN

at Ex. A, CD 214, bar code 3179318-01 (Feb. 4, 2014) ("U.S. Steel Pre-Prelim. Comm.

Re: GVN")).  U.S. Steel argues, and Defendant does not contest, that [[

        ]] is not an input used to manufacture OCTG.  <u>See</u> <u>id.</u>; Def.'s Resp. Br. 40.  The

basis for U.S. Steel's claim that GVN's license covers imports that cannot be used to

make subject merchandise is that the ITCHS Code on the license pertains to [[

                                                                                         ]],

<u>see</u> GVN Supp. A–C Resp. at S1-25(d); U.S. Steel Pre-Prelim. Comm. Re: GVN at Ex.

A, whereas the "Import Item Name" on the "DES Import Item List" of the advance license

placed on the record by GVN indicates [[                                          ]].  <u>See</u> U.S. Steel

Reply Br. at 18; <u>see also</u> GVN Supp. A–C Resp. at Ex. S1–25(d).  Although Commerce

did not note this specific discrepancy on the face of the license at verification, Commerce

verified with supporting documents that GVN's imports under its advance license were

[[     ]] MT of hot rolled coil, which is used to make subject merchandise.  <u>See</u> GVN

Sales Verification Report at 21.  Therefore, Commerce reasonably concluded on the basis

of this supporting documentation, not based upon the license itself, that GVN imported inputs for subject merchandise under its advance license.

U.S. Steel also argues Commerce's decision to grant the duty drawback was not supported by substantial evidence because GVN's "advance license provides only for the export of nonsubject merchandise, i.e., [[                                    ]] and not OCTG."  See U.S. Steel Reply Br. 17 (citing GVN Supp. A–C Resp. at Ex. S1-25(d)).    However, Commerce directly addressed this discrepancy at verification, crediting GVN's explanation that it was able to export its subject merchandise under the license it put on the record, which it conceded covered non-subject merchandise.[35]   See GVN Sales Verification Report at 21.  Commerce reached this conclusion by verifying GVN's claim that an Indian regulation would have required it to obtain a special license to export merchandise declared to be OCTG.   See id.  Although Commerce could have explicitly noted that the "special license" for exporting OCTG would have increased GVN's cost of exporting subject merchandise, it is reasonably discernible that the government credited GVN's explanation because GVN's actions appeared to be driven by business considerations, not by deceiving Commerce.  See id.  Likewise, Commerce reviewed "all commercial invoices for exports under this license, and found that the item description for all exports was for OCTG," and Commerce determined that there were no unreported

---

[35] U.S. Steel argues that "inconsistencies in the commercial invoices and customs invoices provided by GVN cast doubt on the reliability of [the records of GVN's transactions under the ALP to support its duty drawback determination]."  U.S. Steel Reply Br. 19.  However, this discrepancy is not surprising given GVN's claim, which Commerce reasonably credited, that it shipped its subject merchandise under an HTS number that did not pertain to OCTG to avoid applying for a special license.

sales in GVN's sales database.  See id.  Therefore, Commerce reasonably determined

on the basis of the documentation, not the face of the license, that subject merchandise

was exported under the license.

> Next, U.S. Steel argues that GVN's
>
> suggestion that the Indian government permitted [it] to export OCTG under
> the ALP using the tariff code for [[                                    ]] even though they
> were "not listed in the scope of the investigation" . . . simply confirms that
> the ALP does not actually link imported raw materials to exported subject
> merchandise.

U.S. Steel Reply Br. 19 n.2 (internal citation omitted).  However, the fact that GVN was

able to export subject merchandise under a license that did not cover subject

merchandise does not suggest that the advance license program itself does not require

the company to link imported raw materials to exported OCTG.  Regardless of the

mechanics of how GVN received the rebate of import duties it paid, Commerce

reasonably found GVN's record documentation supported all the necessary elements for

drawback eligibility.

### D. Application of Facts Available to Fill a Gap in the Record for GVN's Dual-Grade Products

GVN Plaintiffs contest Commerce's apparent application of facts available with an

adverse inference in determining costs for its N/L-80 grade products.  GVN Plaintiffs Br.

10.  Defendant contends that GVN Plaintiffs failed to exhaust administrative remedies.

See Def.'s Resp. Br. 55, and that Commerce used neutral facts available.  See id. at 54.

The court finds GVN Plaintiffs are not barred from bringing their claim and remands the

matter to Commerce for further consideration and explanation.

### 1.  Exhaustion of Administrative Remedies

Defendant argues that GVN failed to raise any arguments at the administrative level regarding the appropriate costs for its products. See Def.'s Resp. Br. 52.  GVN Plaintiffs respond that they argued that their goods should have been classified as N-80 grade as they were in Commerce's preliminary determination, which implicated these issues.  Consolidated Pls.' Reply Br. 10, Nov. 6, 2015, ECF No. 64.  The court concludes that the exhaustion doctrine should not bar judicial review.

In its initial questionnaire responses, GVN reported COP data for certain sales of N/L-80 OCTG (i.e., "dual use products"), see GVN Sections B & C Questionnaire Responses at C-11, CD 83–90, bar codes 3161960-01–08 (Nov. 4, 2013), as OCTG grade N-80 based upon the invoices supplied by MSL.  See GVN Plaintiffs Br. 4; see also Final Decision Memo at 30.  However, Commerce thereafter found that GVN's N/L-80 product should have been reported and coded as L-80 product.  See Final Decision Memo at 30.

GVN Plaintiffs acknowledge that the result of this reassignment was that most of the dual grade sales did not have COP information from MSL's cost database.  See GVN Plaintiffs Br. 8.  Consequently, as GVN Plaintiffs also acknowledge, "it was necessary for Commerce to use facts available to create product costs to match" these CONNUMs. See id.  Therefore, citing its practice, Commerce assigned the N/L-80 dual grade product costs associated with L-80, which has stricter performance requirements than N-80 grade product.  See id.  Further, in assigning costs to GVN's dual grade sales, Commerce used "the highest cost assigned to a CONNUM with a grade characteristic of L-80."  See GVN

Fuels Limited Final Determination Analysis Memoranda at 5, CD 356, bar code 3215344-01 (July 10, 2014) ("GVN Final Analysis Memo").   GVN Plaintiffs contend that Commerce's use of the highest cost assigned to a CONNUM with a grade characteristic of L-80 represented an adverse inference and an application of AFA.   See GVN Plaintiffs Br. 10.

The statute provides that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."   28 U.S.C. § 2637(d).   Exhaustion of administrative remedies is a doctrine that holds "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."   Consol. Bearings Co. v. United States, 348 F.3d 997, 1003 (Fed. Cir. 2003). The court generally "takes a 'strict view' of the requirement that parties exhaust their administrative remedies before [Commerce] in trade cases."   Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007).   Commerce's regulations require parties to submit a case brief containing all their arguments.   See id.; see also 19 C.F.R. § 351.309(c)(2).   Therefore, the exhaustion requirement is "not simply a creature of court decision, as is sometimes the case, but is a requirement explicitly imposed by the agency as a prerequisite to judicial review."   Id.

The overarching purpose of the exhaustion doctrine is to "allow[] the agency to apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial review–advancing the twin purposes of protecting administrative agency authority and promoting judicial efficiency."   Carpenter Tech. Corp. v. United States, 30 CIT 1373, 1374–75, 452 F. Supp. 2d 1344, 1346 (2006) (citing Woodford v. Ngo, 548 U.S. 81, 88–

90 (2006)).  Nonetheless, even where exhaustion is implicated, the Court of Appeals for the Federal Circuit has consistently held that the application of exhaustion principles in trade cases is exercised with a measure of discretion by the Court.  <u>See, e.g.</u>, <u>Corus Staal</u>, 502 F.3d at 1381; <u>Norsk Hydro Canada, Inc. v. United States</u>, 472 F.3d 1347, 1356 n.17 (Fed. Cir. 2006); <u>Consol. Bearings</u>, 348 F.3d at 1003.

Such discretion cautions against requiring exhaustion where doing so would require a party to speculate as to one of many courses the agency may take.  Requiring such speculation would hinder the progress of the investigation and not serve the interest of promoting administrative efficiency.  Although U.S. Steel raised many of the issues addressed by Commerce in its final determination and GVN could have addressed U.S. Steel's arguments in the alternative, GVN Plaintiffs were not required to predict that Commerce would change course between its preliminary and final determinations.  This is particularly true given that Commerce gave no indication at the preliminary results stage or at verification that it intended to reclassify GVN's dual-use sales as L-80 grade sales. <u>See</u> GVN Sales Verification Report at 20.[36]  Faced with a favorable determination in Commerce's preliminary determination where Commerce had assigned COP information for N-80 grade products to the products in question, GVN Plaintiffs could not be expected to predict Commerce's change in its/their position under such circumstances.

---

[36] At verification, when Commerce discussed its review of the sales in GVN's cost database that were reclassified as having N-80, not L-80, grades, it merely stated that it had "reviewed several MSL invoices and mill test certificates for these reclassified sales, and noted that in each instance, the documentation from MSL was clearly for N-80 graded products."  <u>See</u> GVN Sales Verification Report at 20.

### 2. Commerce's Assignment of Highest Cost Assigned to L-80 Grade Product for GVN's Dual Grade Product

GVN Plaintiffs argue that, if Commerce had followed its practice of finding cost matches for its dual use products, it "should have based its calculation of the missing costs by using its standard model matching methodology to compare the newly designated L-80 CONNUMs to the most similar grade L-80 CONNUM." GVN Plaintiffs Br. 16. According to GVN Plaintiffs, Commerce's assignment of the highest costs associated with L-80 products was, in effect, an adverse inference. See id. at 10–11. Defendant denies that Commerce resorted to an adverse inference, and argues that "Commerce relied on neutral facts available that it drew from the record." Id. at 57.

According to the statute,

> [c]osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise.

19 U.S.C. § 1677b(f)(1)(A). If, however, Commerce determines that the records of the respondent cannot properly form an accurate basis upon which to calculate that respondent's COP, Commerce may use facts otherwise available for calculating a respondent's COP under certain circumstances. See generally 19 U.S.C. § 1677e(a).[37]

---

[37] Commerce shall "use facts otherwise available in reaching the applicable determination" if:
    (1)  necessary information is not available on the record, or
    (2)  an interested party or any other person—
        (A) withholds information that has been requested by [Commerce] . . .,
        (B) fails to provide such information by the deadlines for submission of information or in the form or manner requested . . .

(footnote continued)

If Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information . . . [Commerce] may use an inference adverse to the interests of that party in selecting from among the facts otherwise available." Id. § 1677e(b).[38]

Here, Commerce identified a gap in the record that prevented it from calculating GVN's COP for its N/L-80 products based upon its cost database, finding that "GVN submitted data on the record for sales of N-80 grade OCTG, but it explicitly identified" sales of N/L-80 grade product as N-80 grade product. See Final Decision Memo at 30. Lacking COP data on the record for N/L-80 grade product, Commerce assigned the N/L-80 dual grade product costs associated with L-80 grade product because it has the stricter performance requirements. See GVN Final Analysis Memo at 5.

Commerce could look to facts otherwise available under the statute because it determined the necessary COP information for the dual-grade product was not available on the record. See Final Decision Memo at 30; see also 19 U.S.C. § 1677e(a)(1). In determining what record facts to look to in assigning COP to GVN's dual-grade products,

---

(C) significantly impedes a proceeding under this subtitle, or
(D) provides such information but the information cannot be verified . . . .
19 U.S.C. § 1677e(a).
[38] The statute provides that such adverse inference may include:
Reliance on information derived from—
(1) the petition,
(2) a final determination in the investigation under this subtitle,
(3) any previous review . . ., or
(4) any other information placed on the record.
Id.

Commerce cited its practice that "when the customer orders a product to meet multiple specifications and grades in order to be suitable for a variety of applications, the strictest requirements of any of the standards must be satisfied." See Final Decision Memo at 30 (citing Small Diameter Circular Seamless Carbon and Allow Steel Standard, Line, and Pressure Pipe from Brazil, 70 Fed. Reg. 7,243 (Dep't Commerce Feb. 11, 2005) (final results of ADD administrative review) and accompanying Issues and Decision Memorandum for the Eighth Administrative Review of Small Diameter Circular Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe from Brazil; Final Results of Antidumping Duty Administrative Review at 5, A-351-826, (Feb. 11, 2005), available at http://ia.ita.doc.gov/frn/summary/brazil/E5-584-1.pdf (last visited Mar. 15, 2016) ("Pipe From Brazil I&D")).[39]  Therefore, Commerce assigned GVN's dual-grade product costs associated with L-80 grade product because it met stricter performance requirements. See id.

However, nothing in Commerce's practice indicates that it selects the highest costs associated with the product with the highest performance specifications where there are multiple CONNUMs within that higher performance product category included with a respondent's COP database.  See Pipe From Brazil I&D at 5.  Commerce's analysis of its selection among facts otherwise available in its final determination focuses exclusively

---

[39] In the Pipe From Brazil I&D, Commerce explained that "it is increasingly common for distributors to order pipe that conforms to multiple specifications and grades of steel for maximum flexibility in filling orders by end-users while controlling inventory levels." See Pipe From Brazil I&D at 5.  Since a product that may be suitable for a variety of applications must satisfy the strictest requirements of any of the requirements, Commerce chooses the product with the higher performance requirements. See id.

on its selection of cost information for higher performance L-80 grade product as opposed

to N-80 grade product.  See generally Final Decision Memo at 30.  Commerce only

mentions its decision to assign GVN's dual grade products the highest cost associated

with CONNUMs with grade characteristic of L-80 in its GVN Final Analysis Memo.  See

GVN Final Analysis Memo at 5.  Commerce does not explain its decision to select the

highest cost data for products within the L-80 product grouping.  It can be inferred from

Commerce's discussion that there was varying cost information for L-80 products with

different physical characteristics.  Commerce makes no effort to explain why GVN's N/L-

80 were most similar to the highest cost L-80 products.  Without such explanation,

Commerce's selection of the highest cost information among L-80 products from GVN's

cost database may only have been the product of an adverse inference that GVN's dual

grade products were more cost-intensive than any other L-80 grade products in selecting

among facts otherwise available.  Therefore, Commerce must either explain why

assigning the highest costs for L-80 products from GVN's cost database to its dual use

products was reasonable in light of the characteristics of GVN's dual-use products or

explain its application of an adverse inference by satisfying the legal prerequisites for

doing so under § 1677e(b).[40]

        At oral argument, U.S. Steel cited several examples it argued supported the notion

that Commerce's practice of assigning costs associated with higher performance

---

[40] U.S. Steel speculates that Commerce's decision was supported by substantial evidence because N/L-80 products are in fact more expensive than either N-80 or L-80 grade products. Conf. Oral Arg., 02:35:14–02:35:38.  Commerce made no such finding, and therefore the Court does not need to address these arguments.

products also includes selecting the highest cost products from within the higher

performance product category.  See Conf. Oral Arg., 02:31:35–02:33:45.  However, these

proceedings in fact support only matching the higher performance products based upon

product characteristics that impact overall performance.  See id. (citing e.g., Certain Small

Diameter Carbon and Alloy Seamless Standard, Line, and Pressure Pipe From Romania,

70 Fed. Reg. 7,237 (Dep't Commerce Feb. 11, 2005) (final results of antidumping

administrative review and final determination not to revoke order in part) ("SSLPP From

Brazil") and accompanying Issues and Decision Memorandum for the 2002-03

Antidumping Duty Administrative Review: Certain Small Diameter Carbon and Alloy

Seamless Standard, Line, and Pressure Pipe from Romania at 5, A-485-805, (Feb. 4,

2005), available at http://ia.ita.doc.gov/frn/summary/romania/E5-586-1.pdf (last visited

Mar. 15, 2016) ("SSLPP From Brazil I&D")).

        In its issues and decision memorandum for SSLPP From Brazil, Commerce

explained that:

> [i]n making [its] model-matching decisions, [it] look[s] at a combination of
> product characteristics which are reflected ultimately in the overall
> performance standard of the given specification and the intended end-uses
> which are associated with the performance standards.

SSLPP From Brazil I&D at 36.  The only product characteristics that U.S. Steel argues

impacted product performance were chemical composition and mechanical properties

(i.e., physical characteristics of the product).  See U.S. Steel Resp. Br. 10.  Commerce

did not find that these product characteristics contributed to the higher technical

specifications or that the dual grade product was most similar to the highest cost L-80

product.  Thus, Commerce's practice of assigning the costs of higher grade product to dual-grade product does not include selecting the highest costs within the higher grade product grouping.

Lastly, U.S. Steel argues that Commerce reasonably assigned N/L-80 grade OCTG the highest cost associated with L-80 grade products because "the record is clear that the requirements of N/L-80 grade OCTG [[                    ]] those of L-80 grade OCTG."  See id.  At oral argument, U.S. Steel argued that the record fully justified assigning GVN's dual grade products the highest costs of L-80 grade products because "GVN's own questionnaire response shows that the N/L-80 product met or exceeded the L-80 product specifications."  Conf. Oral Arg., 02:39:37–2:39:56.  U.S. Steel argued GVN's questionnaire responses showed that "the N/L-80 products [[

]] of the L-80 products and [[

 ]] requirements."  Conf. Oral Arg., 02:34:25–02:34:36 (citing GVN Supplemental Sections A–C Response at Ex. S1-14, CD 198, bar code 3175629-06 (Jan 23, 2014) ("GVN Suppl. Secs. A–C Response")).[41]

However, Commerce did not reference GVN's questionnaire responses for the proposition that the costs of N/L-80 product were greater than all L-80 product. Commerce referenced GVN's responses to explain its decision to assign dual-grade products costs of the L-80 products with stricter requirements.  See Final Decision Memo at 30.  Second, the exhibit cited by U.S. Steel merely indicates that the minimum tensile

---

[41] U.S. Steel implied that Commerce relied upon these facts in its Final Decision Memo in citing to this document at page 30, footnote 108.  See id. at 02:34:37–02:34:49.

strength for GVN's N/L-80 product [[                                    ]] than the minimum tensile strength for GVN's L-80 product.  <u>See</u> GVN Suppl. Secs. A–C Response at Exhibit S1-14.  It does not indicate that there was a maximum tensile strength for its L-80 product, so there may have been L-80 CONNUMs that met the tensile strength requirements of N/L-80 product within GVN's cost database.  <u>See</u> <u>id.</u>  Without further explanation, Commerce's decision to apply the highest cost for L-80 product to GVN's dual-grade merchandise was not supported by substantial evidence.

## CONCLUSION

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's <u>Final Determination</u> is sustained with respect to: collapsing issues, level of trade issues, and duty drawback issues; and it is further

**ORDERED** that this action is remanded to Commerce to clarify or reconsider, as appropriate, its application of the thresholds of the ratio test in this investigation, affiliation issues between Jindal SAW, Limited, Jindal Steel and Pipes Limited and [[

]], yield loss data issues, and costs of production of dual use products issues; and it is further

**ORDERED** that Commerce shall file its remand results within 60 days; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments; and it is further

**ORDERED** that the parties shall have 15 days thereafter to file their replies to comments on the remand determination.


 /s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated: May 5, 2016
       New York, New York